### G. W. FARMER v. THE STATE.

No. 4.   Decided January 26, 1910.

**Injuring Fence of Another—Trespass—Peaceable Possession—Insufficiency of the Evidence.**

Where upon trial for unlawfully injuring the fence of another, the evidence showed that the defendant claimed the land upon which prosecutor erected a fence and joined it to the defendant's fence; that defendant had taken down this fence, where it joined his fence, to permit his stock to get to water;' and there was no evidence that the prosecutor was in the quiet and peaceful possession of the land where the fence was taken down by the defendant, but was in fact a trespasser on land claimed by defendant, the conviction could not be sustained. Following McNeely v. State, 50 Texas Crim. Rep., 279, and other cases.

Appeal from the District Court of Kimble. Tried below before the Hon. Clarence Martin.

Appeal from a conviction of unlawfully pulling down and injuring the fence of another; penalty, a fine of $10.

The opinion states the case.

*Moursund, Moursund & Rowe,* for appellant.—Cited Arbuthnot v. State, 38 Texas Crim. Rep., 509; McNeely v. State, 50 Texas Crim. Rep., 279, 17 Texas Ct. Rep., 88; Jenkins v. State, 7 Texas Crim. App., 146.

*John A. Mobley,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was charged with unlawfully breaking, pulling down and injuring the fence of Adam Murr.

Murr testified that his land joined appellant's; that during the year he had occasion to build some fence; this, as he recalled, was about the first of May. The fence ran east and west. Appellant had a fence close to where Murr built his fence; that fence ran north and south; appellant's fence had been located there about eighteen years. He further testified that he built his fence right up to appellant's fence, and set down a post and joined that post; that he set down a post against the fence of appellant, and in that way closed his fence. Murr

testified: "As to whose possession the land was in on which I built that fence, well, I was trying to get possession. Me and Mr. Farmer had swapped land. He had taken his land and I was fencing mine from his out of his pasture. It was along late in the evening when I finished the fence. I guess it was about sundown. The next morning I went down there to see if there were any cattle in there so I could get them out. I found the fence torn down and dragged back. As to how far it was, I never measured the distance; it was something like fifteen or twenty steps. The fence was torn down right where it went up against Mr. Farmer's fence; it started at his fence, and was dragged back west. I saw Mr. Farmer the next morning. I saw him at his son's house. The place where I saw him must have been something like a quarter of a mile from this fence. I had a conversation with him about this fence. I told him I had closed that fence up and this morning I had found it torn down and I wanted to see about it. I wanted to see his son. Mr. Farmer was there but his son was not there. . . . I told Mr. Farmer my fence was torn down, and this is what he said: he said he tore it down." The witness says: "I was trying to get my land out of his pasture. As to whether I was there when that stone pile was put there, there was a line run through there years ago and I helped to run that line. I could not say whether that was the same pile of rock or not; the corner of the section was marked from there. I knew there ought to be a stone pile there somewhere; the pile of rock there was supposed to mark the line."

It further appears from the testimony of this witness there had been an exchange of land between the parties for grazing purposes. There had been no deeds passed; it seems to have been a verbal contract. The witness said that in their conversation Mr. Farmer had not informed him that there was a small strip there on the west of his fence that belonged to him, that was his land, nor did he say that he should not come with his fence on that strip. The fence had not been started, and there was not anything said about the line in the conversation. There had been also a re-exchange of the land.

Appellant, testifying in his own behalf, stated that Murr, in the conversation they had last fall in regard to building the fence, had informed him, appellant, that he, Murr, was going to fence his land out, and Farmer told him all right. Appellant further testified: "In regard to other things, I told him that he could not come over and join on to my fence; he must fence his own land separate to himself. I have about eight or nine sections of land up there where this fence was. On the morning that I removed that fence at that place, I found a bunch of my cattle standing there starving for water. The watering place was about 400 yards southeast of that corner. I just untwisted the wires of that fence and laid them back and let the cattle out. I untwisted the wire from the post that Murr had put in over against my fence. It was about twenty-three or twenty-four steps from that post to the next post. I never authorized or gave Mr. Murr my consent

to put that twenty-three yards of fence there. It was in the spring of the year, and some of my cows had young calves. They had been away from their calves some twelve or fifteen hours when I turned them out." Further testifying, he says: "The water I wanted to get at for my cattle was about four hundred yards south of that corner." He says he probably could have gotten his cattle through a gate that was some distance away from where the fence joined his. He further states that in their conversation he told Murr that he could not connect with his, appellant's, fence, but told him how far he could go with his fence. "I told him he could come to that stone mound mark. The post next to the one that was close to the fence was about ten inches from the stone mound, on the west side. I saw the place where that post was erected; it looked like it was intended for a corner post, and it was about two feet deep." It may be inferred from the testimony that the stone mound referred to marked the division line or corner of the land between the two parties, appellant and Murr. Under the view we take of the record it is unnecessary, we think, to discuss the averments of error in regard to the charge given, and those refused. We do not think the testimony is sufficient to justify the verdict of the jury. McNeely v. State, 50 Texas Crim. Rep., 279, is a case directly in point. See also Klein v. State, 39 S. W. Rep., 369, and Jamison v. State, 27 Texas Crim. App., 442, 11 S. W. Rep., 483. The proposition may be generally stated that it is not so much the title to land that controls in cases of this character as it is the quiet and peaceable possession of the property on which the fence is situate. But the McNeely case, supra, draws the distinction between quiet and peaceable possession of the land on which the fence is situate, and that character of case where the placing of the fence makes the party putting it there a trespasser. This case comes squarely within the rule laid down in the McNeely case, supra. We are of opinion this conviction should not have occurred. Murr was a trespasser and was not in the quiet and peaceable possession of the land.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

McCord, Judge, not sitting.