Dr. Alvin I. THOMAS, Plaintiff-Appellee,
Cross-Appellant,

v.

Eristus SAMS, Individually and As
Mayor of Prairie View,
Defendant-Appellant,

and

City of Prairie View,
Defendant-Cross-Appellee.

No. 82–2359.

United States Court of Appeals,
Fifth Circuit.

May 29, 1984.

Rehearing and Rehearing En Banc
Denied Sept. 17, 1984.

Michael A. Maness, Houston, Tex., for defendant-appellant.

Larry Watts, Laura Oren, Houston, Tex., for Thomas.

John W. Batchan, Jr., Terrance Windham, Houston, Tex., for City.

Before RUBIN and RANDALL, Circuit Judges, and MITCHELL *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

In the course of a dispute concerning the construction by a city of a sewer line across a university campus, a city mayor, who was also ex officio its magistrate and municipal judge, signed a criminal complaint against the university's president. Then, in his capacity as magistrate, he issued a warrant for the president's arrest. As a result, the president was detained for more than two hours until he was able to post a cash bond. Invoking 42 U.S.C. § 1983, the president sued the city and the city official. Although the actions taken by the city official in his judicial capacity as a magistrate were shielded by judicial immunity, we affirm the bench-trial judgment against the city official because the arrest warrant did not immunize his prior illegal conduct. The court rejected the president's claim against the city on the bases that the city had not authorized the mayor to arrest the president and the court was "unwilling to impose liability upon local governments because of the strictly legal actions of their judicial officers." Because the record demonstrates that the mayor's actions represented city policy, we reverse the judgment in favor of the city and hold it jointly liable with its mayor.

* United States District Judge, Eastern District of Louisiana, sitting by designation.

I.

The following facts were found by the district court. The City of Prairie View is an incorporated Texas municipality with a population of 4,000, most of whom are faculty, staff members, and students of Prairie View A & M University. Dr. Alvin I. Thomas is president of the University. Eristus Sams is the City's mayor and, ex officio under Texas law,[1] its municipal judge and magistrate. As magistrate, he is authorized to issue process and warrants for the arrest of offenders; as municipal judge he has jurisdiction over persons committing offenses within the City's corporate limits, including the University campus, for which the maximum punishment is a $200 fine.

The University maintains sewage collection and treatment facilities for its own use and has also provided sewage treatment for a small part of the City on a contract basis. Until 1972, most of the City outside of the University campus was without sewer service. That year, the City sought a federal grant to construct and to operate a sewage facility and to extend its sewer lines. The University also sought a federal grant to construct and to operate an additional sewer facility and to bring its operation into compliance with the Federal Water Pollution Act. To avoid seeking two grants, and to facilitate early accomplishment of both objectives, the City and the Texas A & M University Systems Board of Regents, which had supervisory authority over the University, jointly agreed to operate a sewage collection system serving all parts of the City, including the University campus. The City was to construct the necessary additional collection lines. At the outset, the University was to treat the City's sewage on a contract basis. Eventually, the City was to build a City treatment plant to treat all sewage.

Various problems delayed construction of the City's sewage collection facilities.

1. Tex.Rev.Civ.Stat. Arts. 1007, 1196, 1197; Texas Code of Cr.Proc. Arts. 2.09 and 2.10.

Mayor Sams concluded that the University was unreasonably delaying completion of the City's collection lines, and thus creating a health hazard. The Board of Regents, which had sole authority over such matters, had not approved the easement, service rates, or the plan for construction of the lines because there were legitimate objections on an engineering basis to the City's plans. Despite his awareness that Board approval was a prerequisite but had been denied, Mayor Sams directed the sewer contractor to complete the construction of a four-inch and a six-inch sewer line across University property and to connect these lines to the University's collection and treatment facility. Dr. Thomas instructed Dr. Decatur Rogers, the administrator in charge of the University's physical plant, to do "whatever was necessary" to prevent the City from running sewage through the completed lines. Accordingly, in May, 1978, under the personal supervision of Dr. Rogers, University personnel cut out and capped several sections of pipe in both lines.

Sams signed a complaint charging Dr. Thomas with committing a criminal offense by "coercing" Rogers to destroy City property. The complaint is signed "Eristus Sams, Mayor"; but the district court found that, because the City Council had not voted to authorize the mayor to issue the complaint, "Sams acted as a private citizen in swearing out his complaint although his signature included his governmental title." The district court also found that Sams acted with "personal animosity, malice, and a lack of good faith." Acting in his role as magistrate, Sams then issued a warrant for Thomas's arrest, based on the complaint that he had himself just signed. Pursuant to the warrant the Chief of Police arrested Thomas. Sams, as magistrate, set bond in

the amount of $200, the maximum fine that could be exacted by the Municipal Court.

Thomas attempted to give a personal check as bond; but Sams, acting either as magistrate or municipal judge, refused to accept the check because he believed its payment would be stopped. After slightly over two hours detention, Thomas succeeded in posting the bond in cash and was released.

The district court concluded that the City's construction of the pipeline was a common law and criminal trespass on the University's land.[2] The court added that it could also reasonably be regarded as an attempted theft of service.[3] The University's action in cutting the line was a reasonable attempt to prevent this attempted theft and "continued, egregious trespass."

The destruction of the property of a trespasser by the possessor of land is not actionable under Texas criminal laws.[4] In this situation the University might act to defend its rights "by any means short of a breach of the peace."[5] The prevention of imminent theft by the reasonable use of force is also justified, and is not a crime.[6]

Moreover, the court found, Sams lacked probable cause for the complaint, both because he lacked adequate reason to suspect that a crime had been committed by the president and because he lacked adequate knowledge of the president's role in cutting the lines to justify an arrest. The court found that Sams lacked judicial immunity because he acted in the clear absence of all jurisdiction. His acts could "not be fairly categorized as judicial acts," but on the contrary were "clearly the acts of a governmental executive officer or a complainant." The investigation and complaint were not brought to him originally in his judicial capacity. "He went into the com-

---

2. Tex.Educ.Code Ann. § 51.204, Tex.Penal Code Ann. § 30.05.

3. Tex.Penal Code Ann. § 15.01, 31.04(a).

4. *Simmons v. State*, 156 Tex.Cr.R. 601, 245 S.W.2d 254 (1952); *Morgan v. State*, 99 Tex. Cr.R. 661, 271 S.W. 608 (1925); *Bray v. State*, 87 Tex.Cr.R. 146, 219 S.W. 1102 (1920); and *Farm-

*er v. State*, 58 Tex.Cr.R. 171, 124 S.W. 925 (1910).

5. *McNeely v. State*, 50 Tex.Cr.R. 279, 96 S.W. 1083, 1084 (1906).

6. *Cf.* Tex. Penal Code Ann. § 9.41 (use of force against another to protect one's property).

munity and performed these non-judicial acts himself before reverting to his judicial role." Accordingly, the district court rendered judgment against Sams for $7,500 actual damages, $2,500 punitive damages, and $15,000 attorneys' fees. As already noted, the trial judge held the city not liable because it was "unwilling to impose liability upon local governments because of the strictly legal actions of their judicial officers."

## II.

Judges may, and on occasion do, depart from their judicial roles and inflict grievous hurt on others. Often the allegations of misconduct by judges are hyperbolic and either untrue or unprovable; but sometimes, as here, a person who is a judge intentionally commits a mischievous act. Nevertheless, while courts are not blind to the human vices that may lurk behind the robe, they have struck society's balance in favor of judicial immunity. A wrong committed by a judge might on occasion be remedied by holding the judge a tortfeasor. Much graver harm would be done to the justice system and consequently to the social fabric, however, by requiring judges to account for the reasons why they took judicial action, and to absolve themselves from charges of improper motive or other impropriety. Absolute judicial immunity is an essential shield in a justice system that depends on its judges to "exercise their functions with independence and without fear of consequences,"[7] not an apologia for the errant behavior of judges who act injudiciously or malevolently.[8] To provide the broad protection that these important poli-

cies require, the Supreme Court has ruled that absolute immunity extends to all judicial acts unless such acts fall clearly outside the judge's subject-matter jurisdiction. *Stump v. Sparkman,* 435 U.S. 349, 359–64, 98 S.Ct. 1099, 1106–08, 55 L.Ed.2d 331 (1978).[9]

All parties agree that Sams's acts as magistrate, including issuing the warrant and setting bond, are judicial acts for which he is absolutely immune from liability. We therefore turn our attention to Sams's acts in investigating the pipecutting, and in swearing out the complaint without probable cause and with malice. We apply this circuit's four-part test to determine whether these actions constituted judicial acts, and conclude that they do not: These acts were not part of a normal judicial function, but were plainly executive in nature; they did not center around any pending case, but instead initiated the case; they did not occur in the judge's chambers; and they did not involve Sams's official capacity as a judge. *See Harper v. Merckle,* 638 F.2d 848, 858 (5th Cir.1981), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1982); *McAlester v. Brown,* 469 F.2d 1280, 1282 (5th Cir.1972); *Ammons v. Baldwin,* 705 F.2d 1445, 1447–48 (5th Cir.1983). *See also Henzel v. Gerstein,* 608 F.2d 654 (5th Cir.1979) (the "absence-of-jurisdiction" exception refers to situations in which the judge acts purely in a private and nonjudicial capacity). Sams's acts in initiating the proceedings that led to Thomas's arrest, therefore, are not cloaked in absolute immunity. When the same person "[wears] two hats," one as judge and

---

**7.** *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288, 294 (1967), *quoting Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 349–50, 20 L.Ed. 646 (1871).

**8.** Other policies served by judicial immunity, in addition to the preservation of an independent judiciary, include the need to avoid vexatious litigation against judges and the need for finality in litigation. *See Harper v. Merckle,* 638 F.2d 848, 856 n. 10 (5th Cir.1981), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1982).

**9.** *Harper v. Merckle,* 638 F.2d *supra,* at 857–58; *Sparks v. Duval County Ranch Company Inc.,*

604 F.2d 976 (5th Cir.1979) (en banc), *aff'd sub nom. Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); *Turner v. Raynes,* 611 F.2d 92 (5th Cir.1980), *cert. denied,* 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 129 (1980); *Brewer v. Blackwell,* 692 F.2d 387 (5th Cir.1982); *Watson v. Interstate Fire & Cas. Co.,* 611 F.2d 120 (5th Cir.1980); *Williams v. Rhoden,* 629 F.2d 1099, 1101 (5th Cir.1980); *Henzel v. Gerstein,* 608 F.2d 654 (5th Cir.1979); *Almon v. Sandlin,* 603 F.2d 503 (5th Cir.1979); *Crowe v. Lucas,* 595 F.2d 985 (5th Cir.1979).

the other as a city executive official, he may be liable for an arrest resulting from his acts as a city official. *Crowe v. Lucas,* 595 F.2d 985, 990 (5th Cir.1979).

Nonjudicial public officers of course are not required to err at their own risk; they are protected by an immunity, albeit in most cases a narrower one. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). A public official may, however, be held liable if he violated constitutional or statutory rights that were clearly established at the time he acted such that a reasonably competent official should have then known the rules of law governing his conduct, *unless* the official pleads and proves in his defense extraordinary circumstances by virtue of which he neither knew nor should have known of the relevant legal standard. *Id.,* 457 U.S. at 819, 102 S.Ct. at 2739. While *Harlow* adopted an exclusively objective test for imposing liability, it did not qualify an official's liability for injury resulting from deliberate and malicious acts that violate clearly established statutory or constitutional rights.[10] *Harlow v. Fitzgerald,* 457 U.S. at 818–819, 102 S.Ct. at 2739, 73 L.Ed.2d at 410–411. The district court's finding that Sams acted with such malice is sufficient to force him to face Thomas's allegations without the shield of immunity.[11]

Mayor Sams's reply is that he cannot be held liable under § 1983 because the nonjudicial acts of investigating the pipe-cutting and swearing out the warrant did not result in "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States" and indeed that those acts caused Dr. Thomas no injury at all. Whatever injury Dr. Thomas might have suffered, Sams argues, resulted from the immunized judicial acts of issuing the arrest warrant and setting bail.[12] Sams's theory thus is that those judicial acts constitute an intervening cause between his nonjudicial acts and Thomas's alleged injury. We conclude that Sams's theory is sound, but its application in this case is flawed.

The first prerequisite to recovery under § 1983 is proof that the plaintiff has been deprived of a right "secured by the Constitution and laws of the United

---

**10.** Before *Harlow,* an official could be held liable under either an objective or a subjective standard. The subjective test imposed liability for actions performed "with malicious intention to cause a deprivation of constitutional rights or other injury to the plaintiff." *Bogard v. Cook,* 586 F.2d 399, 411 (5th Cir.1978), *cert. denied,* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979) (quoting *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975)).

**11.** Sams challenges both the trial court's conclusion that he reasonably should have known that the cutting of the pipes either was not a crime or was subject to a complete defense under Texas law, and the court's determination that he lacked probable cause to believe Thomas had instigated the episode. The court found, as a matter of fact amply supported by the record, including testimony from Sams himself, that Sams at all times was aware that the required Board approval had not been obtained. Sams has not demonstrated that the law of trespass in

Texas, so far as it concerns this case, is so obscure that a reasonable person in Sams's position would not understand that the University was entirely justified in interdicting the pipes. Indeed, the evidence supports the court's conclusion that Sams either knew or recklessly maintained "self-serving" ignorance about the illegality of his actions. Because Sams either knew or should have known that no crime was being perpetrated by any University employee, it is irrelevant whether he had probable cause to suspect Thomas' involvement.

**12.** Sams also challenges the district court's finding that Thomas had established all the elements of the common law action for malicious prosecution. Sams asserts, first, that Thomas never pleaded a pendent state law claim for malicious prosecution; and second, that such a claim must fail in any event because the criminal charge is still pending in state court and therefore has not been resolved in Thomas's favor. Because we uphold Thomas's claim under § 1983, we need not consider these issues.

States." *Baker v. McCollan*, 443 U.S. 137, 139, 99 S.Ct. 2689, 2693–95, 61 L.Ed.2d 433 (1979) (detention pursuant to valid warrant did not amount to a deprivation without due process of law). The right to be free from illegal arrest plainly enjoys such protection. As we stated in *Smith v. Gonzales*,[13] however:

> Where an arrest is made under authority of a properly issued warrant, the arrest is simply not a false arrest. *Rodriguez v. Ritchey*, 556 F.2d 1185 (5th Cir.1977) [ (en banc) ]. Such an arrest is not unconstitutional, and a complaint based on such an arrest is subject to dismissal for failure to state a claim. Id.; *Simon v. United States*, 644 F.2d 490 (5th Cir. 1981) (citing *Rodriguez* ); see *Walker v. United States*, 471 F.Supp. 38, 40 (M.D. Fla.1978).

In his concurring opinion in *Rodriguez*, Judge Hill cautioned that an officer who maliciously seeks to obtain a facially valid warrant or indictment should not be absolved of liability simply because he succeeded. 556 F.2d 1185, 1194–95 (5th Cir. 1977) (en banc) (Hill, J. concurring), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 799 (1978). Nevertheless, we have extended the officer's shield further by holding in *Smith v. Gonzales* that even an officer who acted with malice in procuring the warrant or the indictment will not be liable if the facts supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's "independent" decision "breaks the causal chain and insulates the initiating party." 670 F.2d at 526 (citing *Rodriguez*, 556 F.2d at 1193). As the Supreme Court observed in *Baker v. McCollan*, a reasonable division of responsibility between executive and judicial officers is consistent with due process of law. 99 S.Ct. at 2695. *See also, Smith v. Gonzales*, 670 F.2d at 526.

■ Sams did not choose to present the complaint to an impartial intermediary. He deliberately avoided doing so, despite the availability of state judges and justices of the peace who had authority to sign the warrant. Under these circumstances the issuance of the arrest warrant was not an intervening cause: There was no "independent decision" to break the causal chain and to insulate him as the initiating party. Sams acted with "personal animosity, malice, and a lack of good faith" in undertaking the acts that enabled him to take up his magistrate's pen and sign the warrant. He may not innoculate his conduct by that pen-stroke.[14]

Sams's status in signing the complaint has been variously characterized. The district court and both parties have from time to time described that status as executive, "quasi-executive," and as that of a private

---

13. 670 F.2d 522, 526 (5th Cir.1982), *cert. denied*, 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1983).

14. At oral argument, counsel for Sams cited two recent cases to support his argument that no claim cognizable under § 1983 arose from Sams's actions in investigating the pipe-cutting and swearing out the complaint: *Ammons v. Baldwin*, 705 F.2d 1445 (5th Cir.1983), and *Nesmith v. Taylor*, 715 F.2d 194 (5th Cir.1983) (per curiam). In *Ammons*, reviewing under the abuse-of-discretion standard appropriate for an appeal from a denial of a motion for relief from judgment, we held that all of the acts complained of, except one, constituted judicial acts under *Harper v. Merckle, supra*. 705 F.2d at 1447. The defendant judge's nonjudicial act— threatening physical abuse—did not cause an actionable injury because the plaintiff was never placed in imminent fear of bodily harm. We therefore held that the plaintiff's one claim that was not barred by judicial immunity did not

rise to the "minimal level required to invoke federal jurisdiction." *Id.* at 1448. In *Nesmith*, we held that a plaintiff legitimately under compulsion to appear before a court on one count could not state a claim for deprivation of liberty if the second count was based on a complaint maliciously sworn without probable cause. We concluded that the additional, arguably invalid, reason to appear before the court did not diminish the plaintiff's liberty any more than an "additional lock on a jailhouse door" further diminished the liberty of its occupants. 715 F.2d at 196.

Plainly, neither case governs the situation before us. Thomas has alleged more than a de minimis injury from Sams' nonjudicial acts. And those acts did not produce a redundant compulsion to appear; as we have concluded above, those acts caused the deprivation of Thomas' liberty.

citizen.[15] Any finding that Sams acted other than in his official capacity in signing the complaint is clearly in error. Sams signed the complaint as mayor. He did so to prevent interference with the construction that he, as mayor, had ordered and supervised. Indeed, if he were not acting as a public official in doing so, there would be no basis for the district court to have held him personally liable under § 1983 for his actions would not have been performed "under color of" state law. Moreover, in supplemental findings of fact, made in ruling on Sams's motion for a new trial or, alternatively, for amendment of findings of fact and conclusions of law, the district court stated that Sams's acts, including his swearing out of a complaint, were "executive acts" of misguided law enforcement.

### III.

■ A municipality is liable for damages under § 1983 "when execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611, 638 (1978). Sitting en banc, we recently elaborated the concept of policymaking authority in *Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir.1984) (en banc). A city official's edicts or acts do not render the city liable even in a case in which a fact finder might fairly say that the edicts or acts were official policy. "Liability must rest on official policy, meaning the city government's policy, and not on the policy of an individual official. The policy is that of the city, however, where it is made by an official under authority to do so given by the governing authority." *Id.*

at 769. Culpable acts or policy are attributable to the governing body only when made or done by an official to which the governing body had given authority to act or to make policy. We then further defined policy-making authority as

> more than discretion, and it is far more than the final say-so, as a matter of practice, on what water main will be replaced today and whether a building meets city construction standards. City policymakers not only govern conduct; they decide the goals for a particular city function and devise the means of achieving those goals. Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance. The governing body retains the prerogative of the purse and final legal control by which it may limit or revoke the authority of the official.

*Id.*

■ "The issue of authorization, approval or encouragement is generally one of fact, not law." *Turpin v. Mailet*, 619 F.2d 196, 200–01 (2d Cir.1980), *cert. denied sub nom. Turpin v. City of West Haven*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). *See also Bowen v. Watkins*, 669 F.2d 979, 990 (5th Cir.1982). Thomas asserts that the court's finding that Sam's acts did not represent City policy is clearly erroneous. We agree.

The record contains uncontradicted evidence that the City Council of Prairie View entrusted the entire conduct of the installation of the sewage lines and the resultant pipeline dispute to Mayor Sams. He was given the final authority to define the City's goals with respect to the sewage treatment project and to choose the means

---

**15.** Like the district court, counsel for Thomas in oral argument characterized Sams's conduct in various terms. At one point he conceded that the district court's finding that Sams acted as an individual in swearing out the complaint was not clearly erroneous. Were the concession correct, it would vitiate the basis for any judgment against Sams or the City. We do not consider Thomas bound by such an obviously ill-considered remark made by counsel in oral

argument, when it has the effect of completely destroying the plaintiff's otherwise meritorious claim. *Cf. New Amsterdam Casualty Co. v. Waller*, 323 F.2d 20, 25 (4th Cir.1963), *cert. denied*, 376 U.S. 963, 84 S.Ct. 1124, 11 L.Ed.2d 981 (1964) ("[A] party ought not and does not lose his right when his counsel, however formally, advances an erroneous legal theory. If, on the facts disclosed, the party is entitled to some relief, it is the duty of the court to award it.").

of achieving those goals. Sams testified that he had reported regularly to the Council on the progress of the pipeline; that they knew it was crossing University land; and that he had sent the Chief of Police to the University to supervise the operation and, inferentially, to prevent interference with it.

After several interruptions due to the ejections of the City's crew from University land, Sams announced completion of the line at a regular Monday night Council meeting. Subsequently, the University warned the City by letters that the line would be intersected if it was not removed. After the lines had been cut and capped, Jack Echols, the Council member who was Mayor Pro Tem, rushed to report the "offense" to the Mayor. Although Mayor Sams denied at trial that Councilman Echols knew that Sams planned to arrest anyone, the councilman's written statement to the Mayor shows that he expected police action on the "offense." Echols's actions indicated that the Council had not only delegated authority to the Mayor but knew what he was doing. They indicate further that at least one Council member thought Sams had authority to act and was urging him to do so.

That the Council did not expressly authorize Sams by resolution to arrest the University president does not, under these circumstances, immunize the City. The City had delegated to Sams, as its mayor, the power to take all acts he deemed necessary to complete the sewer line. It had, in *Bennett*'s words, "by its conduct or practice encourage[d] or acknowledge[d] the agent in a policymaking role." It had "impliedly acknowledge[d] that the ... [Mayor] act[ed] in lieu of the governing body" to have Thomas arrested.

To the City of Prairie View this sewer project, and the ensuing dispute, was more than merely a routine question of "what water main will be replaced today." The City was engaged in the development of a sewage treatment facility that affected the entire municipality. The application for a grant, the conferences with University officials, letting the contract, and supervising construction had extended over a period of years. The Council had manifested a great interest in the project and the Mayor had kept it informed of any progress. Most of the off-campus residents were without sewage facilities, and the Mayor regarded the situation as posing a serious threat to their health. Under these circumstances, the completion of the pipeline at the expense of the University's property rights, and notwithstanding lawful opposition by the University president, clearly became a goal of the municipality itself, as defined and implemented by its authorized representative Sams. Thomas's arrest was in accordance with City policy, because it was caused by an officer whose acts represented that policy.

## IV.

■■■■ The district court awarded Thomas attorneys' fees of $15,000 after fully considering the factors dictated by *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The computation of such an award is committed to the sound discretion of the trial judge, and we review it only for errors of law and such gross miscalculations as would indicate discretion had been distorted. *Welch v. University of Texas and its Marine Science Institute*, 659 F.2d 531, 535 (5th Cir.1981); *Thomas v. City of New Orleans*, 687 F.2d 80, 84 (5th Cir.1982); *Copper Liquor Store, Inc. v. Adolph Coors Co.*, 624 F.2d 575 (5th Cir.1980) (*Coors* II); *Copper Liquor Store, Inc. v. Adolph Coors Co.*, 684 F.2d 1087 (5th Cir.1982) (*Coors* III). The district judge here weighed all factors, including success and failure on the various issues in the case.[16] The court discounted

---

**16.** Counsel cited, at oral argument, a case currently pending before the Supreme Court, *Pulliam v. Burke*, 82–1432, *cert. granted,* —— U.S. ——, 103 S.Ct. 1873, 76 L.Ed.2d 806 (1983). That case presents the issue whether a magis-

trate's judicial immunity bars an award of attorney's fees to a prevailing party under 42 U.S.C. § 1988, the Civil Rights Attorneys' Fees Awards Act of 1976. The Fourth Circuit held that it did not, *sub nom. Allen v. Burke,* 690 F.2d 376,

**194**

the award, however, for time spent pursuing the City of Prairie View. Because Thomas has prevailed against the City, that discount should be eliminated. In addition, Thomas is entitled to attorneys' fees for this appeal.

For these reasons the judgment against Eristus Sams is AFFIRMED. The case is REMANDED for entry of judgment against the City of Prairie View as a defendant, jointly and in solido with Sams, and for determination of attorneys' fees.

378–79 (4th Cir.1982). The present case raises no such question, for unlike the defendant in

*Burke,* Sams's liability arises from nonjudicial acts.