Demuth KELLOGG, John W. Richardson, Hervey Burnett, and Mary Wilusz, et al., Petitioners (Appellees/Plaintiffs below),

v.

CITY OF GARY, Richard G. Hatcher, Virgil L. Motley, and Frederick P. Kowsky, Respondents (Appellants/Defendants below),

and

John Shettle,
(Appellee/Defendant below).

No. 45S03–9011–CV–710.

Supreme Court of Indiana.

Nov. 8, 1990.

Hilbert L. Bradley, Terry C. Gray, Gary, J. Michael Katz, Katz, Brenman & Angel, Merrillville, for petitioners.

John P. Price, Jon D. Krahulik, Grace M. Curry, Nana Quay–Smith, Bingham Summers Welsh & Spilman, Indianapolis, Gilbert King, Jr., Corp. Counsel, City of Gary, Gary, for respondents.

PIVARNIK, Justice.

This cause comes to us on a petition to transfer from the Third District Court of Appeals. Transfer is sought by Plaintiffs, a class of citizens, who brought action against the city of Gary, certain city officials, and the superintendent of state police, John T. Shettle, for alleged violations of the Federal Civil Rights Statute, 42 U.S.C. § 1983 and the Indiana Firearms Act (now codified at Ind.Code § 35–47–2–3), by denying citizens blank handgun application forms. The trial court entered judgment on a jury verdict in favor of the citizens and against the city and the named city officials. No damages were awarded against the state superintendent. On appeal, the Court of Appeals reversed, and found the failure of the citizens to wait until their claim had been denied in whole or part before bringing suit against the city violated section 12 of the Indiana Tort Claims Act, Ind.Code § 34–4–16.5–12, and was fatal to their claim. *City of Gary v. Kellogg* (1988), Ind.App., 519 N.E.2d 570. Because the holding of the Court of Appeals contravenes that of the United States Supreme Court in *Felder v. Casey* (1988), 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123, we grant transfer and hereby vacate the opinion of the Court of Appeals.

The facts show that for approximately ten years prior to January 1, 1980, applications for handgun permits were routinely available at the office of the Gary, Indiana, Chief of Police. These were state forms which the Gary Police Department obtained from the Indiana State Police and made available to Gary citizens. In an effort to control the number of handguns on the streets in Gary, however, an agreement apparently was reached between Gary's acting chief of police, Virgil L. Motley, and its mayor, Richard G. Hatcher, that these applications no longer would be distributed from Motley's office. A sign to this effect was posted on the Chief's office door, announcing: "No more gun applications will be given out effective January 1, 1980. Thank you.!!! Chief Office." Thereafter, although the Gary Police Department nev-

er refused to accept applications, the application forms no longer were available there, and the record indicates citizens of Gary could not obtain these forms elsewhere. Suit was brought in 1980 by business persons, an attorney, and a homeowner in the community, who testified they needed the guns for security. All were refused gun applications due to the blanket policy discussed above. *Motley v. Kellogg* (1980), Ind.App., 409 N.E.2d 1207, 1208–09, *trans. denied.* Plaintiff sought a preliminary injunction prohibiting further withholding of handgun license applications. The trial court entered an order enjoining State Police Superintendent Shettle from the arbitrary and capricious distribution of applications for handgun permits. Shettle was further ordered to make available to Acting Gary Police Chief Motley such number of handgun permits as he shall request to be made available to the citizens of Gary requesting the same for the purpose of applying for handgun permits. Defendants appealed from the granting of the preliminary injunction, and the Court of Appeals affirmed. *Id.*

Two and one-half years later, Charles Boone obtained leave to file a complaint and petition for issuance of a temporary restraining order against Superintendent Shettle and Police Chiefs Motley and Frederick P. Kowsky. Boone alleged that those officials denied his request to process about fifty (50) handgun applications for B & W Security Agency. The trial court allowed Boone to join the plaintiffs' class and issued a restraining order against the officials. The officials filed their motion for partial summary judgment which alleged non-compliance with the Indiana Tort Claims Act ("ITCA"). The trial court denied the motion and the case went to trial, resulting in a jury verdict in the citizens' favor and against the city and its officials. No monetary damages were assessed against Superintendent Shettle. The trial court subsequently issued a declaratory judgment and permanent injunction in the citizens' favor and awarded $524,600.00 in attorneys fees to the citizens' counsel. The city and its officials appealed and the Court of Appeals reversed, finding the citizens'

action was procedurally barred by their failure to comply with the ITCA.

Pursuant to the ITCA, tort claims against a political subdivision of the State are barred unless proper notice is given within one-hundred and eighty (180) days. IC 34–4–16.5–7. The ITCA also provides that within ninety (90) days after notice, the governmental entity must approve or deny the claim in writing or it is automatically denied. IC 34–4–16.5–10. Finally, a person may not initiate suit unless a claim has been denied in whole or in part. IC 34–4–16.5–12.

The citizens complied with the notice requirement, but did not wait until their claim had been denied before initiating suit. The defendants raised this violation as a defense but the trial court ruled the ITCA did not apply.

The citizens claim they did not have to comply because they alleged a federal claim under 42 U.S.C. § 1983. Citing the law in Indiana and other jurisdictions, the Court of Appeals found this argument was without merit, holding when a litigant chooses a state court forum, the procedural framework of the ITCA overrides that of § 1983. The opinion of the Court of Appeals appeared to be correct until the United States Supreme Court handed down *Felder v. Casey* (1988), 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123, on June 22, 1988. *Felder* came from the State of Wisconsin and involved the same set of circumstances and a tort claims act with provisions similar to Indiana's. The Court held that under the principles of federalism and the supremacy clause (Art. VI, cl. 2) of the Federal Constitution, 42 U.S.C. § 1983 preempted the application of Wisconsin's notice of claim statute to a § 1983 action brought in Wisconsin state court, because the enforcement of the statute stood as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The Court went on to hold that state notice-of-claim statutes are inapplicable to federal § 1983 litigation for two main reasons, as follows:

First, ... the application of the notice requirement burdens the exercise of the federal right by forcing civil rights victims who seek redress in state courts to comply with a requirement that is entirely absent from civil rights litigation in federal courts. This burden ... is inconsistent in both design and effect with the compensatory aims of the federal civil rights laws. Second, ... the enforcement of such statutes in § 1983 actions brought in state court will frequently and predictably produce different outcomes in federal civil rights litigation based solely on whether that litigation takes place in state or federal court. *States may not apply such an outcome-determinative law when entertaining substantive federal rights in their courts.*

*Felder*, 487 U.S. at 141, 108 S.Ct. at 2308, 101 L.Ed.2d at 139–40 (emphasis added); *Werblo v. Hamilton Heights School Corp.* (1989), Ind., 537 N.E.2d 499. *See also Howlett v. Rose* (1990), — U.S. —, 110 S.Ct. 2430, 110 L.Ed.2d 332 (state as well as federal courts have jurisdiction over § 1983 cases, but individual states may not rely on their own common law heritage to exempt from federal liability persons that Congress subjected to liability).

*Felder* is dispositive of this issue. Accordingly, we now grant transfer and vacate the opinion of the Court of Appeals reported at 519 N.E.2d 570.

Because the Court of Appeals' decision did not address all of the issues raised by the city and its officials on appeal below, our vacating its decision leaves the following consolidated issues to be resolved:

1. Whether the citizens have a cause of action for damages pursuant to 42 U.S.C. § 1983;
2. Whether the officials and the city of Gary are immune from suit;
3. Whether the trial court erred in excluding Gary residents from the jury;
4. Whether the trial court erred in certifying this as a class action for damages and whether the jury's award of compensatory and punitive damages was improper;

5. Whether certain of the trial court's jury instructions were improper; and
6. Whether attorneys' fees were properly awarded pursuant to 42 U.S.C. § 1988.

Because the citizens did not comply with the provisions of the ITCA, the trial court's separate award of compensatory and punitive damages under this "state tort" theory is hereby reversed. Whether the citizens could have maintained a separate cause of action for damages in tort under Indiana law is a moot issue which we do not decide.

For reasons set forth below, we now hold the citizens have a cause of action for damages pursuant to 42 U.S.C. § 1983 and the city and its officials (at times herein collectively referred to as "city") are not immune from suit under § 1983. We find the city has waived any objection it may have had to the trial court's excluding Gary residents from the jury. We further hold, however, the trial court erred in certifying this as a class action for damages; accordingly, we limit the amount of compensatory and punitive damages awarded to those class members who were in immediate danger of having their licenses expire due to the actions of the defendants herein. We further find that because the citizens were the prevailing parties for purposes of 42 U.S.C. § 1988, they are entitled to an award of a reasonable attorney's fee as part of the costs, but the amount of fees the trial court awarded was excessive.

Additional facts will be supplied where necessary.

### I.

The citizens claim their civil rights were violated when the city of Gary and its officials cut off the supply of application forms for handgun permits. Furthermore, even after the citizens obtained injunctive relief against the defendants below to issue and process the application forms, the evidence showed the city and its officials improperly recommended certain applications for denial and in some instances completely failed to forward the applications to the superintendent of state police.

The Civil Rights Act, 42 U.S.C. § 1983, provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to *the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,* shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983 (emphasis added). The citizens claim three bases for recovery under 42 U.S.C. § 1983: (1) denial of equal protection of the laws in violation of the Fourteenth Amendment; (2) violation of a constitutionally protected right to bear arms under the Second Amendment; and (3) deprivation of a property or liberty interest without due process of law in violation of the Fifth and Fourteenth Amendments. We now address each of these theories of recovery in turn, keeping in mind our standard of review: the trial court's judgment will be affirmed if sustainable on any theory or basis found in the record on appeal. *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, 157.

### Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides, in pertinent part, as follows:

> No State shall ... deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const., Art. XIV, § 1. The citizens maintain they were deprived of equal protection of the laws because, unlike other Indiana citizens, they were denied access to the state procedure which allowed them to register for handgun licenses. In addition, within the city itself, the citizens claim an equal protection violation because the mayor's personal bodyguards were able to get handgun licenses while the rest of the citi-

zens were not even able to apply. Even after they obtained their injunctive relief, the evidence showed similarly situated persons were treated differently with regard to whether they received a favorable recommendation from the Gary Chief of Police.

Before proceeding further, we first note the trial court designated the plaintiffs' class as follows:

> 1) all present holders of gun permits commencing on January 1, 1978 and ending February 5, 1980; [and]
>
> 2) all citizens of the City of Gary who are desirous of obtaining a gun permit.

*Record* at 66. As a class, the citizens were denied access to the state procedure for obtaining handgun licenses. To this extent, we agree they were denied the protection of a state procedural law available to other Indiana citizens. However, this does not necessarily entitle them to an award of damages. Turning to their claim of disparate treatment within the city of Gary itself, the citizens presented evidence that, after the injunction issued, similarly situated Gary citizens were not treated equally. The Gary Chief of Police recommended some class members' applications for approval and some for denial. However, even if certain class members received arbitrary and capricious recommendations for denial, the class could not recover as a whole for disparate treatment between its own members. Moreover, the evidence showed that Superintendent Shettle issued handgun licenses to the plaintiff class members over the police chief's negative recommendations.

The city correctly notes that although the citizens alleged an equal protection violation in their Second Amended Complaint, they never tendered an equal protection instruction to the jury. Therefore, the city argues, the jury's verdict could not possibly be based on an alleged equal protection violation. Moreover, the damages instruction submitted to the jury directed them to base their award, if any, on the deprivation of liberty and property under the Fourteenth Amendment. This instruction provided, in pertinent part:

Among the elements of injury and harm which you should consider are:

1. The violation of their constitutional rights to bear arms for the defense of themselves and the State under Article 1, Section 32, Indiana Constitution, and deprivation of liberty and property under the 14th Amendment, including applicable federal statutes; ....

Inst. No. 7, given with modification at pages 491–92 of the *record*. Insofar as the citizens of Gary were unable to apply for handgun licenses between January 1 and February 5, 1980, a right under the laws of this state to which other Indiana citizens were entitled, we hold they were deprived of equal protection of law in violation of the Fourteenth Amendment. However, the temporary restraining order entered on February 5, 1980, and the temporary injunction entered on February 29, 1980, remedied this situation. The citizens did not seek compensatory damages for an equal protection violation, but rather sought compensation for the deprivation of a claimed property or liberty interest without due process of law. Indeed, since the jury was not instructed to award damages based on an equal protection violation, the city urges us not to consider this theory of recovery on appeal. Because the defendants are appealing from monetary damages and not the injunctive relief awarded, we agree that the citizens cannot now argue they are entitled to either compensatory or punitive damages based on an equal protection theory which the jury was never instructed on.

### Second Amendment

■ The citizens' next theory of recovery also fails. In *United States v. Miller* (1939), 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206, the National Firearms Act withstood a constitutional challenge brought by Jack Miller and Frank Layton, who were indicted for transporting in interstate commerce a double-barrel twelve-gauge shotgun having a barrel less than eighteen (18) inches in length. The Act required this firearm to be registered, and it was not. Miller and Layton challenged the Act on its face, alleging it was an unconstitutional attempt to usurp police power reserved to the states and it offended the Second Amendment to the United States Constitution, which provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const., Amend. II. The *Miller* Court rejected these claims, holding:

In the absence of any evidence tending to show that possession or use of a "shotgun having a barrel of less than eighteen inches in length" at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.

*Miller*, 307 U.S. at 178, 59 S.Ct. at 818, 83 L.Ed. at 1209. Numerous federal cases have followed *Miller*, citing it for the proposition that the Second Amendment is not a grant of a right, but "a limitation only upon the power of Congress and the National Government...." *See, e.g., New Hampshire v. Sanne* (1976), 116 N.H. 583, 364 A.2d 630, *quoting Presser v. Illinois* (1886), 116 U.S. 252, 265, 6 S.Ct. 580, 584, 29 L.Ed. 615, 619. Moreover, the Second Amendment has never been incorporated into the Fourteenth and made applicable to the states. Therefore, there is no right under the Second Amendment to keep and bear arms, such as handguns, which do not have some reasonable relationship to the preservation or efficiency of a well regulated militia.

### Due Process

■ The citizens' final basis of recovery is grounded on the Due Process Clause of the Fourteenth Amendment, which provides no state shall "deprive any person of life, liberty, or property, without due process of law...." U.S. Const., Art. XIV, § 1. At issue is whether the city deprived the citizens of a liberty or property interest without due process of law. The citizens maintain the evidence established they were deprived of one or more of the following liberty or property interests without

due process of law: the "right" to bear arms, the "right" to carry a handgun with a license, the "right" to a handgun license, the "right" to apply for a handgun license, and the "right" to obtain a blank handgun license application form. We first turn to the question of whether any of these "rights" constitute a liberty or property interest entitled to Fourteenth Amendment protection.

In *Board of Regents v. Roth* (1972), 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, the United States Supreme Court spoke of a protectible property interest in the following terms:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a *legitimate claim of entitlement* to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> *Property interests*, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that *stem from an independent source such as state law*—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561 (emphasis added). Roth was a teacher who was not rehired after his fixed one year term at a state university. The Court held that Roth failed to show that the nonrenewal deprived him of an interest in "liberty" or that he had a "property" interest in continued employment, as defined above.

Four years later, the United States Supreme Court, in *Paul v. Davis* (1976), 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405, reaffirmed that state law may define substantive property or liberty interests which are protected by the Fourteenth Amendment's Due Process Clause:

> It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either "liberty" or "property" as meant in the Due Process Clause. These interests attain this constitutional status by virtue of the fact that they have been initially recognized and protected by state law,[5] and we have repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status.

*Id.* at 710–11, 96 S.Ct. at 1165, 47 L.Ed.2d at 419. In the footnote to the above-quoted passage, the *Paul* Court noted:

> [5] There are other interests, of course, protected not by virtue of their recognition by the law of a particular State but because they are guaranteed in one of the provisions of the Bill of Rights which has been "incorporated" into the Fourteenth Amendment. . . .

*Id.* at 710–11 n. 5, 96 S.Ct. at 1165 n. 5, 47 L.Ed.2d at 419 n. 5. Accordingly, one must look to both state and federal law in determining whether there is a liberty or property interest entitled to Fourteenth Amendment protection. *See also Meachum v. Fano* (1976), 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (liberty interest may originate in the federal constitution or have its roots in state law; transfer of inmates from medium security institution to other institutions without a hearing did not infringe or implicate a liberty interest within the meaning of the Due Process Clause of the Fourteenth Amendment); *Wolff v. McDonnell* (1974), 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935, 951 (state created liberty interest in good time credits to its prisoners entitled inmate "to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state created right is not arbitrarily abrogated"); *Baer v. City of Wauwatosa* (7th Cir.1983), 716 F.2d 1117, 1122 (property, for purposes of the Fourteenth Amendment, defined "as what you hold securely as a result of state or federal law" (citing *Reed v. Village of Shorewood* (7th Cir.1983), 704 F.2d 943,

948)). Accordingly, our inquiry does not end because there is no liberty or property interest in bearing handguns which stems from the Second Amendment; we must also look to state law for guidance.

Article 1, § 32 of the Indiana Constitution is entitled "Bearing arms" and provides as follows:

> The people shall have a right to bear arms, for the defense of themselves and the State.

Indiana Const., Art. I, § 32. Our Court of Appeals recognized this substantive right in *Schubert v. DeBard* (1980), Ind.App., 398 N.E.2d 1339, when it stated:

> We think it clear that our constitution provides our citizenry the right to bear arms for their self-defense.

*Id.* at 1341. *Schubert* was handed down on January 15, 1980, two weeks after Mayor Hatcher held his press conference announcing that handgun application forms would no longer be made available to the citizens of Gary. We agree with the Court of Appeals' analysis in *Schubert,* and now find that this right of Indiana citizens to bear arms for their own self-defense and for the defense of the state is an interest in both liberty and property which is protected by the Fourteenth Amendment to the Federal Constitution. *Cf. Quilici v. Village of Morton Grove* (7th Cir.1982), 695 F.2d 261 (village control ordinance that prohibited handguns within Morton Grove, Illinois, withstood constitutional challenge; prohibition held to be a valid exercise of the police power to which the Illinois Constitution explicitly subjected its citizens' right to keep and bear arms), *cert. denied* (1983), 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170. This interest is one of liberty to the extent that it enables law-abiding citizens to be free from the threat and danger of violent crime. There is also a property interest at stake, for example, in protecting one's valuables when transporting them, as in the case of a businessman who brings a sum of cash to deposit in his bank across town.

This right to bear arms for the defense of one's self and his property, however, is not absolute. The state may regulate the exercise of this right. It has done so by statute. The Indiana Firearms Act, now codified in Title 35, Article 47 of the Indiana Code, puts certain limitations on the substantive right to bear arms with regard to handguns:

> a person shall not carry a handgun in any vehicle or on or about his person, except in his dwelling, on his property or fixed place of business, without a license....

IC 35–47–2–1. IC 35–47–2–3(a)(1) sets out the procedural mechanism by which Indiana regulates handgun possession, as follows:

> A person desiring a license to carry a handgun shall apply to:
>
> (1) the chief of police or corresponding law enforcement officer of the municipality in which he resides; ....

In accordance with this statute, blank application forms for handgun permits were normally made available to Gary citizens at the Gary Police Chief's Office. The city cut off this procedural mechanism at the outset when it refused to distribute the blank handgun application forms. The city is quick to point out that no one's handgun was confiscated, no one's application was allowed to expire, and no one was ultimately denied a handgun permit. However, by its actions, the city denied the citizens access to the state's procedural process which guaranteed them a substantive right under the Indiana Constitution.

The city correctly notes whether one has a liberty or property interest in a firearms license, as opposed to an application for a license, depends in large part on the amount of discretion given to the state licensing authorities. *Erdelyi v. O'Brien* (9th Cir.1982), 680 F.2d 61. The Ninth Circuit Court of Appeals in *Erdelyi* held that plaintiff did not have a property interest in obtaining her first handgun license. The court looked at the pertinent state statutes and stated:

> [w]here state law gives the issuing authority broad discretion to grant or deny license applications in a closely regulated field, initial applicants do not have a

property right in such licenses protected by the Fourteenth Amendment.

*Erdelyi,* 680 F.2d at 63. In *Baer v. Wauwatosa* (7th Cir.1983), 716 F.2d 1117, the Seventh Circuit Court of Appeals held that aspirations to obtain a firearms license are not constitutionally protected as a property interest under the Due Process Clause of the Fourteenth Amendment.

In the instant case, however, no discretion was involved in granting or denying license applications when the application process itself was cut off at the very outset. Obviously, there can be no discretion involved in reviewing application forms if they are not made available to the public in the first instance. *Erdelyi* and *Baer* can be distinguished on this point alone, since they both involved an exercise of discretion by the licensing authority in denying one firearms license to a single citizen. In this case, the city refused to distribute blank application forms to any of its citizens. Obviously, Police Chief Motley could not exercise his broad discretion in recommending the applications for approval or denial since the application process was cut off in the first instance.

█ In *Matthews v. State* (1958), 237 Ind. 677, 148 N.E.2d 334, this Court upheld a state and federal constitutional challenge to the Indiana Firearms Act and, with regard to licensing discretion, stated the following:

> When the statute here in question provides that the Superintendent of State Police *shall* issue to the applicant a license, if it appears that he is of good character and reputation and a suitable person, it requires that such Superintendent must determine whether or not the applicant meets these qualifications and if, in the opinion of the Superintendent the conditions of the statute are met, he has no discretion in the matter but must issue the license.

*Id.* at 685, 148 N.E.2d at 337 (emphasis in original). *See also Schubert v. DeBard* (1980), Ind.App., 398 N.E.2d 1339, 1341 ("if it is determined under IC 35–23–4.1–5 that the applicant has met the conditions of the statute, the superintendent has no discre-

tion to withhold the license"). Therefore, provided that all of the conditions of the Indiana Firearms Act are met, the applicant has "a legitimate claim of entitlement" in a handgun license. Therefore, under the principles set forth in *Roth, supra,* provided that all of the conditions of the Indiana Firearms Act are met, we now recognize in this state a liberty or property interest in carrying a handgun with a license.

Finally, in *McKinney v. George* (7th Cir. 1984), 726 F.2d 1183, 1189–90, the Seventh Circuit recognized where state substantive law grants an individual a liberty or property interest, one cannot be deprived of that substantive interest without due process of law. In *McKinney,* state police officers arrested the plaintiff and had him involuntarily committed to a state mental institution. After holding that the arresting officers had probable cause and therefore did not deprive McKinney of his due process rights, the court went on to say:

> a state can if it wants confer extra liberties which the due process clause will then also protect against deprivations without due process.

726 F.2d at 1189. The *McKinney* court continued:

> a series of cases ... hold that if a state gives prisoners (whose natural liberty has been suspended) a form of liberty, as by entitling them to release before the end of their terms if they behave themselves for a prescribed period, the state may not deprive them of that liberty, any more than it may deprive a person of his natural. liberty, without due process of law.

*Id.* (Citations omitted.) Similarly, the framers of the Indiana Constitution gave the citizens of this state the "extra" liberty or property interest in bearing arms for their own self defense and for the defense of their state which the Due Process Clause of the Fourteenth Amendment will protect.

However, the *McKinney* court ultimately determined the Illinois statutory scheme did not enlarge the liberty interests of its citizens, but merely provided a procedural mechanism by which Illinois police officers

were denied the authority to seize a person suspected of being deranged without either a signed petition or the officer's own personal observation. The *McKinney* court held that this was a state created procedural rule and not a substantive right which rose to the level of a liberty interest within the meaning of the Fourteenth Amendment. *Id.* at 1190 (quoting *Shango v. Jurich* (7th Cir.1982), 681 F.2d 1091, 1101). Likewise, the city maintains, the citizens in the instant case were deprived of a mere state created procedural right when Mayor Hatcher directed Police Chief Motley to cut off the supply of blank handgun license application forms. This argument is unpersuasive. Without access to the application process, the citizens' underlying substantive right to carry a handgun with a license (provided that all requirements of the Indiana Firearms Act are met), was cut off as well.

Finally, the city cites *Azeez v. DeRobertis* (N.D.Ill.1982), 568 F.Supp. 8, for the proposition that the mere violation of state law by a local official or officials is not a violation of a federal right. At issue in *Azeez* was the failure of state prison officials to act on certain grievances brought by a prisoner. The *Azeez* court held the plaintiff's state constitutional claims did not state a claim for relief under § 1983. However, unlike the instant case, the rights complained of in *Azeez* were merely procedural in nature. Indeed, the *Azeez* court admitted that "state created procedural protections may be evidence of a parent substantive right." *Azeez,* 568 F.Supp. at 10. In the instant case, the parent substantive right is rooted in the Indiana Constitution. Accordingly, pursuant to *Roth, supra,* and its progeny, and for reasons set forth above, we hold this parent substantive right to be both a property and liberty interest for purposes of § 1983 because it stems from an independent source of state law.

For all of the foregoing reasons, we now hold there is a state created right to bear arms which includes the right to carry a handgun with a license, provided that all of the requirements of the Indiana Firearms Act are met. This right is protected by the Due Process Clause of the Fourteenth Amendment and is both a property and liberty interest for purposes of § 1983.

After the injunctive relief was awarded, certain applications from the plaintiffs' class were recommended for denial, while others similarly situated were recommended for approval. However, the evidence further showed that Superintendent Shettle issued handgun permits to those who testified on behalf of the plaintiffs' class over the police chief's negative recommendations. The citizens allege that although these licenses were ultimately issued, there was a delay of eight (8) to sixteen (16) weeks in processing occasioned by the allegedly improper negative recommendations. The record, however, does not bear this out. The citizens ask us to compare a letter from Superintendent Shettle to a Mr. Richard Spence, dated January 11, 1983, in which the superintendent states it takes eight (8) to ten (10) weeks for the state superintendent's office to process his application, with the testimony of Charles Boone, who testified that it took twelve (12) to sixteen (16) weeks for B & W Security Agency employees to get their handgun permits issued over the Police Chief Kowsky's negative recommendations for denial in the Fall of 1982. From this record, it appears the delay occasioned by a negative recommendation for denial was four (4) to six (6) weeks, and not eight (8) to sixteen (16). This delay, or a significant portion thereof, could also be attributed to the fact that B & W Security Agency was seeking 116–120 handgun permits at or about the same time. There was further evidence that a recommendation for denial without a specified reason usually resulted in a ten (10) day delay in processing while the police chief was required to supplement his negative recommendation with the appropriate reasons for denial.

In any event, the citizens argue these delays in processing constituted a deprivation of a liberty or property interest without due process of law. We do not agree. This delay in processing did not result in a deprivation of the underlying substantive right to carry a handgun with a license.

The state's licensing process is set up in such a way that the state superintendent can, in his discretion, override a local police chief's negative recommendation. That is exactly what happened here. A four (4) to six (6) week delay, even if occasioned by a local police chief's improper recommendation of denial, at most constitutes the deprivation of a state created procedural right which "is not itself a liberty interest within the meaning of the Fourteenth Amendment." *Shango*, 681 F.2d at 1101. In other words, one cannot claim a liberty or property interest in the state procedure itself. If a local police chief abuses his power and recommends applications for denial as a matter of course, the citizens' sole remedy lies in a state action to enforce the provisions of the Indiana Firearms Act.

■ The citizens further contend that some applications were never even forwarded to the state police superintendent. Although it is true that the licensing authorities have broad discretion in issuing handgun licenses, they have no discretion to withhold the license of an applicant who has met the conditions of the Indiana Firearms Act. *Matthews, supra; Schubert, supra.* Clearly, there is no way to determine whether one has met the requirements of the Indiana Firearms Act without allowing him to apply for a handgun license. Whether the procedural mechanism of supplying blank handgun license application forms is cut off at the outset or whether the processing of the completed applications is halted by not forwarding them to the state, the underlying substantive right to carry a handgun with a license (provided that all requirements of the Indiana Firearms Act are met), is being taken away. In this regard, certain gun application records from the Gary Police Department were introduced into evidence and compiled by Mary Wilusz, one of the plaintiffs herein. Mrs. Wilusz's compilation showed that in 1980, the Gary Police Department sent twenty (20) more completed handgun applications to the state police superintendent than it received from citizens that year. Mrs. Wilusz explained this discrepancy by saying someone must have returned a completed application to the Gary Police De-

partment which was not previously recorded "returned." Her compilation further showed that there were forty five (45) more applications returned to the Gary Police Department than forwarded to the state superintendent in 1981 and one hundred ninety three (193) more applications returned than forwarded in 1982. It would appear from this compilation that this was not a mere delay in the system, but a breakdown in the process itself. No doubt, the intentional and deliberate failure to forward a completed application to the state superintendent also constitutes a deprivation of a liberty or property interest. This is more insidious than announcing publicly the application process will be cut off altogether. (We note parenthetically that in *Daniels v. Williams* (1986), 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662, the Supreme Court held the loss from a negligent act of a state official is not to be considered a "deprivation" for purposes of § 1983; accordingly, the mere negligent failure to forward an application to the state superintendent would not be actionable under § 1983.) However, the citizens presented no evidence that any of these applications belonged to those members of the plaintiffs' class to whom the jury ultimately awarded damages.

It is undisputed that from January 1, 1980 to February 5, 1980, no Gary citizen could obtain a handgun license application form. Without having filled out the proper application form, a license could not be obtained, and without a license, one could not legally carry a handgun outside of his residence or place of business. Nevertheless, the city argues, even if the citizens had a property or liberty interest at stake, no one's handgun was confiscated, no one's handgun license was allowed to expire, and no one was ultimately denied a handgun license. This, of course, is only true because of the prompt action taken by the citizens in getting a temporary restraining order issued on February 5, 1980, a preliminary injunction on February 29, 1980 (later modified on March 20, 1980), and successfully defending the interlocutory appeal from taken by the city immediately there-

after. *Motley v. Kellogg* (1980), Ind.App., 409 N.E.2d 1207, *trans. denied.*

The City cites *Reichenberger v. Pritchard* (7th Cir.1981), 660 F.2d 280, a case where the Seventh Circuit held the mere possibility of remote or speculative injury or invasion of rights will not amount to a deprivation of rights giving rise to a § 1983 action. The plaintiffs in *Reichenberger* were two Wisconsin nightclub owners whose clubs sold liquor by the drink and offered "nonobscene nude dancing entertainment." Local religious leaders approached the city council in an attempt to have their liquor licenses revoked and businesses shut down. While litigation was pending in the Wisconsin state courts with regard to plaintiffs' liquor licenses, plaintiffs initiated a § 1983 action in federal court. Because there was never a revocation of the plaintiffs' liquor licenses, the court held there was no deprivation of any right giving rise to a § 1983 cause of action. Likewise, the city argues, there was no deprivation here. *Reichenberger* can be distinguished on its facts alone. First, it involved two nightclub owners whereas the instant case affected an entire city. While there was only the threat of the plaintiffs losing their liquor licenses in *Reichenberger*, the state handgun license application process was actually cut off at the outset in the instant case. It was this termination of the application process itself that constituted a deprivation of the underlying substantive right. This is not a case of "remote or speculative injury." There was an actual deprivation and it was necessary for the citizens to seek injunctive relief in order to keep their existing handgun licenses from expiring and to *reclaim* the application process itself.

■ Having recognized a liberty and property interest in carrying a handgun with a license, provided that all requirements of the Indiana Firearms Act are met, and that the city deprived its citizens of that interest by terminating the application process, we now address the citizens' substantive and procedural due process claims. Substantively, the citizens argue the deprivation herein was arbitrary and capricious

and lacked a reasonable basis. The evidence showed that out of 600–800 handgun permitees in Lake County only one committed a crime, forgery, which did not involve the use of a handgun. Procedurally, the citizens argue, they were not provided with a hearing at any time, either before or after the city refused to distribute the handgun license application forms.

The city argues, on the other hand, that even if there was a deprivation of a property or liberty interest, there were adequate post-deprivation remedies on the state level to fulfill federal procedural due process requirements: injunctive relief for violation of the Indiana Firearms Act and monetary relief under the Indiana Tort Claims Act. The requirements of procedural due process are satisfied because of these available state remedies, according to the city, and the citizens should have been precluded from suing under § 1983. The city further urges that the right to substantive due process is no greater than the right to procedural due process; moreover, to accept the proposition that the citizens have a liberty interest in being free from arbitrary and capricious government action would be tantamount to finding a federal right to monetary damages every time a citizen was affected by state governmental action.

Justice Stevens, in his concurring opinion to *Daniels v. Williams* (1986), 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662, and its companion case, *Davidson v. Cannon* (1986), 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677, noted the three components of the Due Process Clause of the Fourteenth Amendment:

[.] First, it incorporates specific protections defined in the Bill of Rights. ....

[.] Second, it contains a substantive component ... which bars certain arbitrary government actions "regardless of the fairness of the procedures used to implement them." ....

[.] Third, it is a guarantee of fair procedure ... the State may not ... take property without providing appropriate procedural safeguards.

474 U.S. at 337, 106 S.Ct. at 677–78, 88 L.Ed.2d at 672 (footnotes and citations

omitted). Justice Stevens went on to discuss whether the existence of an available state remedy would defeat a § 1983 claim and concluded that an available state remedy would never preclude a *substantive* due process claim, but in certain circumstances may preclude a *procedural* due process claim:

> If the claim is in the first category (a violation of one of the specific constitutional guarantees of the Bill of Rights), *a plaintiff may invoke § 1983 regardless of the availability of a state remedy.*
>
> \* \* \* \* \* \*
>
> Similarly, if the claim is in the second category (a violation of the substantive component of the Due Process Clause), *a plaintiff may also invoke § 1983 regardless of the availability of a state remedy.*
>
> \* \* \* \* \* \*
>
> A claim in the third category—a procedural due process claim—is fundamentally different. .... ... the deprivation itself does not necessarily reflect any "abuse" of state power. .... In a procedural due process claim, it is not the deprivation of property or liberty that is unconstitutional; it is the deprivation of property or liberty *without due process of law*—without adequate procedures.

474 U.S. at 337–39, 106 S.Ct. at 678, 88 L.Ed.2d at 672–73 (footnotes and citations omitted, emphasis supplied in part). This three-part analysis was most recently articulated by the Supreme Court in *Zinermon v. Burch* (1990), 494 U.S. ——, 110 S.Ct. 975, 108 L.Ed.2d 100, a case involving the procedural due process rights of a mental patient who successfully claimed he had been improperly admitted and detained at Florida State Hospital. We now turn to each of the three components of the Due Process Clause of the Fourteenth Amendment, as set forth above.

The first component relates to specific provisions contained in the Bill of Rights. Since there is no federally recognized individual right to bear handguns under the Second Amendment and no other provision of the Bill of Rights is implicated here, this first component does not apply.

The second component is a claim of substantive due process. In this regard, the citizens argue the deprivation herein was arbitrary and capricious and lacked a reasonable basis. We agree. As mentioned, the citizens presented evidence that out of 600–800 handgun permitees in Lake County, only one committed a crime, forgery, which did not involve the use of a handgun. Suspension of the handgun license application process did nothing less than deprive the citizens of a right guaranteed to them under the Indiana Constitution. The cause may have been noble, given Hatcher's vocal concern about the purported rise in the amount of violent crime in Gary, but the facts show that handgun permitees were not the ones committing the crimes. Indeed, there was testimony from Theodore Abrams, one member of the plaintiffs' class, that crimes against his person and property had actually been thwarted in the past because he was able to legally arm himself with a handgun. *Record* at 1783–87.

The city claims the Indiana Tort Claims Act fulfills federal due process requirements. However, the availability of a state remedy is a relevant consideration only with regard to the citizens' claim of procedural due process. The availability of a state remedy does not enter into our analysis of the citizens' substantive due process rights. As the Supreme Court stated in *Zinermon:*

> the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 88 L.Ed.2d 662, 106 S.Ct. 662 (1986). As to these two types of claims [violation of specific protections defined in the Bill of Rights and the substantive component of the Due Process Clause], the constitutional violation actionable under § 1983 is complete when the wrongful action is taken. *Id.,* at 338, 88 L.Ed.2d 662, 106 S.Ct. 662 (STEVENS, J., concurring in judgments). A plaintiff, under *Monroe v. Pape* [365 U.S. 167, 81 S.Ct. 473, 5

L.Ed.2d 492], may invoke § 1983 regardless of any state-tort remedy that might be available to compensate him for the deprivation of these rights.

*Zinermon,* 494 U.S. at ——, 110 S.Ct. at 983, 108 L.Ed.2d at 113–14.

We find the evidence presented in the instant case adequately demonstrates not only arbitrary and wrongful government action, but an abuse of power as well. IC 36-4-5-3 enumerates the powers and duties of mayors and provides, in pertinent part, as follows:

The executive shall: ...

(4) Recommend, in writing, to the legislative body actions that the executive considers proper;

(5) Call special meetings of the legislative body when necessary; ....

Mayor Hatcher could have proposed his gun control policy to the city council who is vested with legislative authority. The city council then could have drafted and voted on an ordinance, perhaps banning handguns altogether in the city of Gary, if it felt this was appropriate (although it is doubtful that such an ordinance would withstand a challenge under the Indiana Constitution). Hatcher exceeded his authority when he suspended the handgun license application process by mayoral decree alone.

Accordingly, for the reasons stated above, we find the actions of the city and its officials in cutting off the supply of handgun license application forms to the citizens of Gary were arbitrary and capricious and lacked a reasonable basis. The availability of a post-deprivation remedy on the state level is of no moment. The citizens have successfully proven a substantive due process violation.

■ We next consider whether the citizens should have been precluded from pursuing a procedural due process claim because of the availability of an adequate state remedy. The city once again cites *Erdelyi v. O'Brien* (9th Cir.1982), 680 F.2d 61, where the Ninth Circuit addressed, in a footnote, the precise factual issue presented in the instant case:

Under [California] state law Erdelyi is entitled to mandamus from a state court if her claim that O'Brien had a policy of denying all applications is true.

*Erdelyi,* 680 F.2d at 64 n. 2 (citation omitted). Accordingly, the city concludes, the citizens' due process rights were not violated because they, too, were able to go into state court and obtain an injunction pursuant to the Indiana Firearms Act. Moreover, according to the city, the citizens' proper remedy for damages, if any, should have been sought via the Indiana Tort Claims Act.

However, it does not necessarily follow from this passage alone that the citizens should have been precluded from pursuing a § 1983 claim. Moreover, it should be noted that *Erdelyi* was handed down before the United States Supreme Court's decision in *Daniels.*

Once again, Justice Stevens' concurrence in *Daniels* provides some insight:

In consequence, when [1] a predeprivation hearing is clearly not feasible, [2] when the regime of state tort law provides a constitutionally unobjectionable system of recovery for the deprivation of property or liberty, and [3] when there is no other challenge to the State's procedures, a valid § 1983 [procedural due process] claim is not stated. For, unlike cases in the other two categories—those in which the alleged deprivation violates a substantive federal right—if a procedural due process claim lacks a colorable objection to the validity of the State's procedures, no constitutional violation has been alleged.

474 U.S. at 339–40, 106 S.Ct. at 679, 88 L.Ed.2d at 673–74 (footnotes omitted). The citizens here do not challenge any of the post-deprivation procedures available under state law; the only issue is whether a predeprivation hearing was clearly not feasible.

In the instant case, no predeprivation hearing was held. Unlike *Daniels, supra,* (slip and fall caused by jailer's negligence), there is nothing to suggest that a predeprivation hearing was "clearly not feasible." *See also Hudson v. Palmer* (1984), 468

U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (predeprivation hearing not feasible to prevent random and unauthorized acts of prison guard) and *Parratt v. Taylor* (1981), 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420, *overruled in part by Daniels, supra*, (predeprivation hearing not feasible to prevent negligent loss of prisoner's hobby kit). Hypothetically, if the city was able to show it was in a state of emergency that necessitated the immediate confiscation of all handguns and suspension of the licensing process, then perhaps a predeprivation hearing may not have been feasible. One would be hard pressed to imagine such a scenario. Indeed, the city does not and cannot advance this argument. At the very least, the mayor could have held an emergency session of the city council and proposed a city ordinance banning handguns in Gary if he felt that was a reasonable solution. *Cf. Quilici v. Village of Morton Grove* (7th Cir.1982), 695 F.2d 261, *cert. denied* (1983), 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170. This was not done, however.

Since there is nothing to suggest that a predeprivation hearing was clearly not feasible, the existence of an available state remedy does not preclude the citizens from pursuing a procedural due process claim under § 1983.

We now turn to the merits of the citizens' procedural due process claim. The citizens were not provided with a hearing at any time, either before or after the city refused to distribute the blank handgun application forms. The only notice given the citizens in the instant case was Mayor Hatcher's press conference announcement that the application forms would no longer be made available and that anyone who wanted to challenge his authority was welcome to take him to court. The issue is whether some type of predeprivation hearing was necessary to comport with the mandate of procedural due process. Due process "calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge* (1976), 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 33 (quoting *Morrissey v. Brewer* (1972), 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33

L.Ed.2d 484, 494). "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Toney–El v. Franzen* (7th Cir.1985), 777 F.2d 1224, 1228 (*citing Cleveland Board of Education v. Loudermill* (1985), 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503), *cert. denied sub nom., Toney–El v. Lane* (1986), 476 U.S. 1178, 106 S.Ct. 2909, 90 L.Ed.2d 994.

In *Eldridge, supra,* the United States Supreme Court heard a Fifth Amendment procedural due process challenge to the constitutionality of the procedures for terminating disability benefits. The Court held that, unlike the case of welfare recipients treated in *Goldberg v. Kelley* (1970), 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287, no evidentiary hearing is required prior to the termination of Social Security disability payments. The *Eldridge* Court stated the following:

> our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors:
>
> [.] First, the private interest that will be affected by the official action;
>
> [.] second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and
>
> [.] finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 334–35, 96 S.Ct. at 903, 47 L.Ed.2d at 33 (citation omitted).

The deprivation in the instant case was not the result of administrative error. It was not the prerogative of the city's chief executive officer and chief of police to circumvent Indiana law which expressly grants its citizens the right to apply for handgun licenses. At most, Mayor Hatcher was authorized to propose an ordinance to the city council, perhaps banning hand-

guns altogether in Gary. The private interests of all Gary citizens in being able to apply for and receive handgun licenses in an effort to protect themselves, their families and businesses from the high crime rate in Gary is certainly important enough for there to be "additional or substitute procedural safeguards" employed to prevent the application process from being terminated by executive decree. Finally, the "fiscal and administrative burdens that the additional or substitute procedural requirement would entail" would be minimal at best, since this cessation of the application process is better left to the city council, whose business it is to pass ordinances for the benefit of the city.

For all of the foregoing reasons, we conclude that the citizens· have proven a legitimate procedural and substantive due process claim. Accordingly, we now find the citizens were deprived of a federally protected, state created, substantive right to carry a handgun with a license (provided that all requirements of the Indiana Firearms Act are met) when the application process was terminated on January 1, 1980. We reject, however, the citizens' claims that the city police chief's negative recommendations deprived them of a liberty or property interest without due process of law.

We now turn to the issue of immunity.

## II.

 Even if the citizens have set forth a *prima facie* § 1983 claim, the city maintains, Mayor Hatcher and Police Chiefs Kowsky and Motley should enjoy either an absolute or qualified immunity from monetary damages. Courts have extended absolute immunity to judges and legislators, but the city has failed to cite any authority with regard to high level executive officials. Instead, the city argues by analogy, relying primarily on *Supreme Court of Virginia v. Consumers Union* (1980), 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641.

In *Consumers Union*, the issue was whether the Supreme Court of Virginia and its chief justice were officially immune from suit in an action brought under 42

U.S.C. § 1983 challenging the Virginia Court's disciplinary rules governing the conduct of attorneys. Also at issue was whether attorneys fees could properly be awarded under 42 U.S.C. § 1988 against the Virginia Court and its chief justice in his official capacity. The case arose when Consumers Union sought to publish a legal services directory for the Arlington Co., Virginia area. Consumers Union encountered difficulty when lawyers in the area declined to supply the requested information for fear of violating the Virginia Bar Code's prohibition against lawyer advertising.

The Virginia Supreme Court had the inherent authority to regulate and discipline attorneys; pursuant to statute, the Virginia Court was authorized to "promulgate and amend rules and regulations ... [p]rescribing a code of ethics governing the professional conduct of attorneys-at-law...." *Id.* at 721, 100 S.Ct. at 1969, 64 L.Ed.2d at 647. The Virginia Supreme Court, therefore, played a legislative role in drafting the Bar Code for its state. The courts of Virginia, including the Supreme Court, played an adjudicative role in enforcing the Bar Code, but also had additional enforcement power. It had the express statutory authority to issue a rule to show cause against any attorney that it observed engaging in any act of unprofessional conduct. No complaint needed to be filed first by the State or any third party. The Virginia Court could initiate disciplinary proceedings on its own.

The *Consumers Union* Court held that the Virginia Court and its members were immune from suit when acting in their legislative capacity; i.e., passing the Bar Code. However, because of its own inherent and statutory enforcement powers, immunity did not shield the Virginia Court and its chief justice from suit. Although it held that the Virginia Court and its chief justice were not immune from suit, the *Consumers Union* Court ultimately reversed the District Court's award of attorney's fees. In doing so, the Court stated:

We are unable to agree that attorney's fees should have been awarded for the

reasons relied on by the District Court. Although the Virginia Court and its chief justice were subject to suit in their direct enforcement role, they were immune in their legislative roles. Yet the District Court's award of attorney's fees in this case was premised on acts or omissions for which appellants enjoyed absolute legislative immunity. This was error.

*Consumers Union*, 446 U.S. at 738, 100 S.Ct. at 1978, 64 L.Ed.2d at 657.

The city in the instant case compares the Virginia Court's "legislative" role with Mayor Hatcher's "policymaking" role, and the Virginia Court's "enforcement" role with Mayor Hatcher's "policy implementation" role. Hatcher's stated policy was to reduce the number of handguns in the city of Gary in an effort to lower the amount of violent crime which took place there. In short, the city argues, Mayor Hatcher should enjoy absolute immunity in this "policymaking" role; he should not be hampered by fear of litigation. According to the city, the question then becomes whether Hatcher was ever able to implement his policy. Because of the citizens' prompt action in obtaining injunctive relief, the application process was cut off only for a very short period of time. However, there was also evidence that, even after the applications were made available, the police chief improperly recommended certain handgun license applications for denial. The city maintains there is no direct evidence that the mayor's policy affected the police chief's recommendation to deny these individual handgun license applications. This, however, is not the central issue here.

This case involves the broader issue of whether a mayor has the authority to implement a policy which would take away the right of all citizens within his jurisdiction to apply for a handgun license. We hold he has no such authority. As the city's chief executive officer, he has no legislative role other than recommending, in writing, to the legislative body actions that he considers proper. IC 36–4–5–3(4). This he did not do.

For these reasons, the city's reliance on *Consumers Union* is misplaced and, accordingly, neither the mayor nor the police chiefs under him are entitled to absolute immunity in this case.

■ Nonjudicial public officers are, in some instances, entitled to a qualified immunity for their discretionary actions. The Seventh Circuit Court of Appeals, in *Thomas v. Sams* (5th Cir.1984), 734 F.2d 185, *cert. denied sub nom. Prairie View v. Thomas* (1985), 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 612, set forth this qualified immunity standard as follows:

Nonjudicial public officers of course are not required to err at their own risk; they are protected by an immunity, albeit in most cases a narrower one. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 410 (1982). A public official may, however, be held liable if he violated constitutional or statutory rights that were clearly established at the time he acted such that a reasonably competent official should have then known the rules of law governing his conduct, *unless* the official pleads and proves in his defense extraordinary circumstances by virtue of which he neither knew nor should have known of the relevant legal standard. *Id.*, 457 U.S. at 819, 102 S.Ct. at 2739.

*Thomas*, 734 F.2d at 190 (emphasis in original).

The United States Supreme Court, in *Davis v. Scherer* (1984), 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139, *reh'g denied* (1984), 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919, stated the qualified immunity standard as follows:

Whether an official may prevail in his qualified immunity defense depends upon the "objective reasonableness of [his] conduct as measured by reference to

clearly established law." .... No other "circumstances" are relevant to the issue of qualified immunity.

*Id.* at 191, 104 S.Ct. at 3017, 82 L.Ed.2d at 147. *Davis* involved a suit brought by Gregory Scherer, a radio-teletype operator against his former employer, the Florida Highway Patrol, for improperly discharging him without a formal pretermination or a prompt post-termination hearing. The District Court found that Scherer had a property interest in his job and that the procedures which the Florida Highway Patrol followed to discharge him were constitutionally inadequate under the Fourteenth Amendment; that Florida's statutory provisions governing removal of a state employee were unconstitutional; and that the officials of the Florida Highway Patrol had forfeited their qualified immunity from suit under § 1983 because Scherer's due process rights were clearly established at the time of his dismissal. Five days after the entry of the District Court's order, the Fifth Circuit Court of Appeals held, in an unrelated case, that Florida officials in 1978 had violated no well-established due process rights in discharging a permanent state employee without a pretermination or a prompt post-termination hearing. *Weisbrod v. Donigan* (5th Cir.1981), 651 F.2d 334. On reconsideration, the District Court vacated its prior holding that the officials of the Florida Highway Patrol had forfeited their immunity by violating Scherer's clearly established constitutional rights. Nevertheless, the District Court reaffirmed its monetary damage award on the basis that proof that an official had violated clearly established constitutional rights was not the sole way to overcome the official's claim of qualified immunity. Citing *Scheuer v. Rhodes* (1974), 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90, 103, the District Court applied the "totality of the circumstances" test and held: "if an official violates his agency's explicit regulations, which have the force of state law, it is evidence that his conduct is unreasonable." *Scherer v. Davis* (N.D.Fla.1981), 543 F.Supp. 4, 19. The Court of Appeals for the Eleventh Circuit affirmed. *Scherer v. Graham* (11th Cir.1983), 710 F.2d 838.

The United States Supreme Court reversed, considering only the issue of qualified immunity.

The *Davis* Court rejected the "totality of the circumstances" test as articulated in *Rhodes, supra,* and based its decision on the fact that Scherer had "demonstrated no violation of his *clearly established* constitutional rights." *Davis,* 468 U.S. at 193, 104 S.Ct. at 3018, 82 L.Ed.2d at 148 (emphasis in original). The *Davis* Court continued:

> "an official would not be held liable in damages under § 1983 unless *the constitutional right he was alleged to have violated* was 'clearly established' at the time of the violation." .... Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.

*Id.* at 194, 104 S.Ct. at 3019, 82 L.Ed.2d at 149 (citations omitted, emphasis in original). In the footnote immediately following the above-quoted passage, the *Davis* Court noted, in pertinent part:

> officials sued for violations of rights conferred by a statute or regulation, like officials sued for violation of constitutional rights, do not forfeit their immunity by violating some *other* statute or regulation. .... In the present case ... there is no claim that the state regulation itself or the laws that authorized its promulgation create a cause of action for damages or provide the basis for an action brought under § 1983.

*Id.* at 194 n. 12, 104 S.Ct. at 3019 n. 12, 82 L.Ed.2d at 149 n. 12 (emphasis in original).

In the instant case, the citizens *do* claim that violations of the Indiana Constitution and the Indiana Firearms Act provide the basis for a cause of action under § 1983. As stated, a general right to bear arms in Indiana is rooted in Art. 1, § 32, of the Indiana Constitution. By our opinion today, we formally and explicitly recognize a state created, substantive right to carry a handgun with a license, provided that the provisions of the Indiana Firearms Act are met. This right is based, in large part, on this Court's holding in *Matthews v. State*

(1958), 237 Ind. 677, 148 N.E.2d 334, that the state police superintendent has no discretion in issuing handgun licenses if an applicant meets the qualifications of the Indiana Firearms Act. Under *Board of Regents v. Roth* (1972), 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, we recognize this right as a liberty or property interest protected by the Fourteenth Amendment to the United States Constitution. The next issue we address is whether this right was "clearly established" on January 1, 1980.

In *Anderson v. Creighton* (1987), 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523, the Supreme Court elaborated on the term "clearly established":

> the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 531 (citations omitted). At issue in *Anderson* was whether a federal law enforcement officer who participates in a search that violates the Fourth Amendment may be held personally liable for money damages if a reasonable officer could have believed that the search comported with the Fourth Amendment. Anderson was an agent of the Federal Bureau of Investigation who conducted a warrantless search of a home with the reasonable belief that a bank robbery suspect might be found there. The Court found the agent should be permitted to argue, on qualified immunity grounds, that he is entitled to summary judgment because, in light of the clearly established principles governing warrantless searches, he could, as a matter of law, reasonably have believed that the search of the home was lawful. *Id.* at 641, 107 S.Ct. at 3040, 97 L.Ed.2d at 532. In the instant case, the jury found Mayor Hatcher and

the police chiefs under him could not have reasonably believed what they were doing was lawful. Part of this may have been based on Hatcher's own statement that he considered this a test case and that if anyone wanted to challenge his policy they could take him to court. The unlawfulness of his actions was apparent in light of pre-existing law and he knew or reasonably should have known it.

Nevertheless, the city claims the right we recognize today was not clearly established on January 1, 1980, and cites the following language from *Matthews:*

> Article 1, § 32, *supra*, does not say that the people shall have a right to bear pistols, or any other specific kind or type of arms.

*Matthews*, 237 Ind. at 686–87, 148 N.E.2d at 338. This, however, is not the issue. We do not recognize today an unconditional right to carry a handgun or any other specific type of arms. We do recognize the right to carry a handgun with a license, provided all requirements of the Indiana Firearms Act are met. Carrying a concealed firearm is a privilege subject to licensing by the state. However, as we stated in *Matthews*, if one meets the requirements of the Firearms Act, the state superintendent of police has no discretion and must issue the license. No one, including local city officials, has the right to interfere with this licensing process. As this Court expressly stated in *Matthews*, in upholding the Firearms Act against a challenge under the Due Process Clause of the Fourteenth Amendment and Art. 4, § 1, of the Indiana Constitution:

> *This is not an action where appellant is complaining of any arbitrary or capricious action by the local Chief of Police or the Superintendent of State Police in denying him a license to carry a pistol;* nor is this an attack on any rules or regulations prepared or promulgated by the licensing officer. The sole question then presented is whether the statute is invalid because it fails to provide sufficient standards to

guide the licensing officer in the administration of the Act.

\* \* \* \* \* \*

Thus it is readily apparent that the Act fixes the general standard of fitness, character, and reputation necessary to require the issuance of a license and provides a review by the Circuit Court *to protect the applicant against any arbitrary, capricious or fraudulent action by the licensing officers.*

*Id.* at 682–84, 148 N.E.2d at 336–37 (emphasis added, footnote omitted). Inherent in this analysis, although not expressly stated, is the recognition of a property or liberty interest in carrying á handgun with a license, provided that all requirements of the Indiana Firearms Act are met. If no such liberty or property interest existed, there would be no reason "to protect the applicant against any arbitrary, capricious or fraudulent action by the licensing officers." *Id.*

We agree the contours of this right to carry a handgun with a license, provided all requirements of the Indiana Firearms Act are met, were sufficiently clear in that a reasonable official would have understood what he was doing violated that right. We therefore find this right to have been "clearly established" when the mayor announced his policy.

In addition, we uphold the jury's determination that Hatcher and his police chiefs failed to plead and prove in their defense extraordinary circumstances by virtue of which they neither knew nor should have known of the relevant legal standard. *Harlow v. Fitzgerald* (1982), 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396, 411. Hatcher testified he sought legal counsel from Gary city attorney Anton Gill before announcing his policy. The evidence showed attorney Gill did not give Hatcher a written legal opinion, but merely stated it was his opinion that the city was under no legal duty to provide handgun license application forms to its citizens. It was up to the jury to assess the witnesses' credibility and give it the weight it deserved, applying the objective standard set forth in *Harlow, supra.* We will not disturb their judgment in this regard. *Martin v. Roberts* (1984), Ind., 464 N.E.2d 896, 904.

Finally, the city maintains that the jury instruction on qualified immunity misstated the law. This instruction read as follows:

You are instructed that as to a discretionary function only, a defendant who has violated the constitutional rights of the plaintiffs will nonetheless have a defense if he believed in good faith that his actions were lawful and if that belief was a reasonable one for him to hold. First, he must prove that he actually did believe, at that time that the action he took was lawful.

Second, the defendant must prove that he held such a belief in good faith. If you find that the defendants, individually or collectively, were motivated by malice for the plaintiffs, or acted in callus [sic] disregard of or with indifference for the plaintiffs['] rights, you must find the defendants, individually or collectively, as you find the evidence to be, liable to the plaintiffs.

Third, the individual defendants must prove that it was reasonable for them to reach the conclusion they did. You will not consider this part of the case unless you have found that the plaintiffs['] rights were violated. Thus you may start from the proposition that the defendant was, at the least, mistaken about the legality of his conduct. You must decide whether his mistake was the sort that a reasonable [sic] prudent defendant might make.

In this respect, there are two conditions that the defendant must satisfy in order to establish this part of the defense. He must prove both that at the time he took the action the law was not clearly established, and that he relied upon some legal authority to support his actions. An [sic] defendant is not allowed to act in violation of settled law, or to violate the clearly established constitutional rights of the plaintiffs. Thus, if you find that the constitutional rights of the plaintiffs were clear, you must ren-

der judgment for the plaintiffs. However, the mere fact that the law was in dispute is not sufficient to establish a defense for the defendant. He must, in addition, prove that he relied on some legal authority to establish that his view of plaintiffs['] constitutional rights was reasonable, although ultimately mistaken.

The burden of proof as to all of these elements is on the defendants. The plaintiffs do not have to prove that the defendant acted from malice, or that the defendant intended to violate their rights. Rather the burden is upon the defendant to prove by a preponderance of the evidence that any violation of plaintiffs['] rights were occasioned by his reasonable good faith belief that his actions were lawful.

Inst. No. 2, given as modified at pages 485–86 of the *record*. The city maintains this instruction put the burden on the defendants to prove both an objective and subjective component of good faith immunity. We do not agree. We find this instruction properly set forth the objective qualified immunity standard articulated in *Harlow, supra,* as it spoke in terms of the defendant's reasonable good faith belief. We find no error in this instruction.

Accordingly, for all of the reasons set forth above, we find the defendants herein are entitled to neither an absolute nor qualified immunity from damages.

### III.

We now address the alleged trial court error in excluding Gary residents from the jury. We are satisfied by the trial court's remarks at pages 971–75 of the record in response to the city's Motion for Mistrial that all parties stipulated to exclude Gary residents from the jury. Moreover, the city fails to cite to this Court any authority in support of its position in violation of Ind.R.App.P. 8.3(A)(7).

The issue has been waived.

### IV.

We now turn to the issues of class certification and damages. As previously stated, the class was designated on February 5, 1980, as follows:

1) all present holders of gun permits commencing on January 1, 1978 and ending February 5, 1980; [and]

2) all citizens of the City of Gary who are desirous of obtaining a gun permit.

*Record* at 66. The first subclass covered the handful of people whose permits would have expired on or between January 1 and February 5, 1980. This subclass also included those Gary citizens who had a current handgun permit as of February 5, 1980. The first subclass was comprised of 1,961 citizens. The second subclass covered every other Gary citizen "desirous of obtaining a gun permit," a group practically impossible to identify. The jury awarded compensatory and punitive damages totalling eight hundred eighty thousand dollars ($880,000.00) to the first subclass and twelve dollars ($12.00) to the second subclass. The trial court's judgment on the jury verdict was entered on April 6, 1983, and later corrected by way of a written order entered January 10, 1985. *Supplemental Record* at c-f. This written order can be recapitulated in the following manner:

As to the plaintiffs' claimed violation of Indiana tort law pursuant to Ind. Const. Art. I, Sec. 32, and the Indiana Firearms Act, IC 35–23–4.1–5:

| Compensatory Damages | | |
|---|---|---|
| | Subclass 1 | Subclass 2 |
| Hatcher: | $22,800.00 | $1.00 |
| Motley: | 3,800.00 | 1.00 |
| Kowsky: | 2,000.00 | 1.00 |
| City: | 11,400.00 | 1.00 |

### Punitive Damages

| | Subclass 1 | Subclass 2 |
|---|---|---|
| Hatcher: | $170,000.00 | $1.00 |
| Motley: | 20,000.00 | 1.00 |
| Kowsky: | 10,000.00 | 1.00 |

---

As to the plaintiffs' claimed violation of the Fourteenth Amendment of the United States Constitution and the Civil Rights Act of 1871 found at 42 U.S.C. § 1983:

### Compensatory Damages

| | Subclass 1 | Subclass 2 |
|---|---|---|
| Hatcher: | $20,000.00 | $1.00 |
| Motley: | 5,000.00 | 1.00 |
| City: | 175,000.00 | 1.00 |

### Punitive Damages

| | Subclass 1 | Subclass 2 |
|---|---|---|
| Hatcher: | $400,000.00 | $1.00 |
| Motley: | 40,000.00 | 1.00 |

---

The citizens maintain the city and its officials have waived any challenge to the amount of damages awarded by failing to object to the jury verdict forms the citizens submitted at trial, relying instead on verdict forms tendered by Superintendent Shettle but refused by the trial court. The citizens maintain the city and its officials also failed to preserve the error in their Motion to Correct Errors. We recognize, however, that the jury allowed two sets of damages, one for a violation of "Indiana tort law" and one for a violation of § 1983. The trial court's judgment on this jury verdict allowed a double recovery for a single wrong. This constitutes fundamental error which cannot be waived. In addition, the damages allowed for the claimed violation of "Indiana tort law pursuant to Ind. Const. Art. I, Sec. 32, and the Indiana Firearms Act, IC 35–23–4.1–5" must be vacated, since the plaintiffs did not comply with the Indiana Tort Claims Act, as discussed at the beginning of this opinion.

■ The city of Gary continues to argue if it is liable for any compensatory damages, it is liable solely under a theory of *respondeat superior* and should not have been assessed compensatory damages in an amount greater than those assessed against its officials. In this regard, we note the following passage from *Monell v. New York City Dept. of Social Services* (1978), 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611, a case in which the Supreme Court ruled that local governing bodies and local officials in their official capacities can be sued directly under § 1983 for monetary, declaratory, and injunctive relief:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. at 2037–38, 56 L.Ed.2d at 638. The mayor's edicts and the chief of police's acts in the instant case certainly represented the "official policy" of the city of Gary. However, we must point out when the mayor announced his policy on January 3, 1980, he was accompanied not only by Gary Police Chief Motley, but Lake County Prosecutor Jack Crawford and Gary City Judge Douglas Grimes as well.

These men, along with Hatcher and Motley, were there on behalf of the city of Gary. Accordingly, the city of Gary was not merely vicariously liable for the actions of Mayor Hatcher and Police Chief Motley. The trial court did not err in upholding the jury's compensatory damage award against the city merely because it was greater than the compensatory damages assessed against Hatcher and Motley.

■ We now address the issue of whether the trial court erred in allowing this lawsuit to proceed as a class action for compensatory and punitive damages pursuant to 42 U.S.C. § 1983. Indiana Trial Rule 23(A) sets forth the prerequisites of a class action as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Ind.Trial Rule 23(A).

We first note the city's argument in its Motion to Correct Errors, filed June 3, 1983:

> 4. The Court erred it [sic] It's ruling on February 5, 1983 [sic, 1980] that this cause of action was a proper class action. For the Court made said ruling without benefit of a hearing or waiver of a hearing and over objection of counsel. The Judge stated during argument that: no evidence was necessary and that he didn't think there was any argument about who made up the class. If the Court had held a hearing pursuant to T.R. 23C, the Court may have made a proper determination of the class, if any.

*Record* at 1. There is no transcript of a hearing on class certification in the record; accordingly, the citizens argue, this Court cannot review the evidence presented at that hearing. The city maintains there is no transcript because there was no hearing. Whether there was a hearing or not, we find the trial court erred in allowing this class action to proceed as a lawsuit for damages.

When the city cut off the supply of handgun license application forms, it was necessary and proper for *all* citizens of Gary to bring a class action to obtain the injunctive and declaratory relief they sought. However, not all members of the class had questions of law or fact common to them when it came to assessing damages. The second subclass, "all citizens of the City of Gary who are desirous of obtaining a gun permit," was practically incapable of definition. The jury recognized the mayor's handgun policy affected them, but decided to award only *de minimus* damages. All members of the first subclass were in danger of having their licenses expire within two years of January 1, 1980. Obviously, those with a license about to expire in January, 1980, were in immediate danger of expiration. On the other hand, those who acquired a handgun license in 1979 would not have to reapply until 1981. They had their handgun licenses and obviously were unaffected by the unavailability of handgun license application forms in January of 1980. The members of the first subclass were damaged in varying degrees, depending on their own personal circumstances. Some suffered no damage at all. The trial court therefore erred in allowing the case to be tried as a class action for damages.

This error is exemplified by the following jury instruction:

> In determining the measure of compensatory damages in this class action of 1,961 known persons and others whose exact number is unknown, you are instructed that *an assessment of damages will require that you engage in some estimation. It is not possible to prove with absolute mathematical certainty the compensatory damages to which the plaintiffs may be entitled based upon the conduct of the defendants.* Because of this, the law does not require that plaintiffs prove with actual precision the

measure or actual amount of their damages. The law only requires that the plaintiffs show sufficient evidence to give you a basis for making a reasonable estimate or approximation. You are to reach a reasonable estimate on the basis of the evidence presented in this case. The mere fact that there is some uncertainty in the proof of the measure of damages should not affect your determination. *Plaintiffs' recovery should in no way be impaired because they do not prove their damages in a precise and certain amount.* You may consider among other relevant factors, the amount of proven damages multiplying either the minimum or maximum amounts by the number of known members of the class, the failure of the defendants to comply with the constitutional rights of the plaintiffs pursuant to the United States Constitution and the Constitution of the State of Indiana, the failure of the defendants to comply with the statutes of the State of Indiana and the Civil Rights Act of 1871 found at 42 United States Code Sections 1983, 1985, 1986, and the extent to which the defendants' failure of compliance was intentional.

Inst. No. 29, given with modification at pages 519–20 of the *record* (emphasis added). We find that this instruction invited the jury to speculate as to the amount of compensatory damages sustained by each class member and instructed them to multiply this amount by the number of members in the class. The compensatory damage award cannot stand. The citizens' reliance on *Lloyds of London v. Lock* (1983), Ind. App., 454 N.E.2d 81, *modified on reh'g*, 455 N.E.2d 967, and *Town of Rome City v. King* (1983), Ind.App., 450 N.E.2d 72, for the proposition that all damages need not be proven with absolute mathematical certainty is misplaced since neither case was a class action for damages.

As in cases of mass tort injury, the instant case simply did not lend itself to class action treatment on the question of damages. *See, e.g., McDonnell Douglas Corp. v. United States Dist. Ct., C.D. of Cal.* (9th Cir.1975), 523 F.2d 1083 (improper certification by district court of wrongful death action arising out of airplane crash that killed 335 passengers constituted clear abuse of discretion sufficient to invoke extraordinary writ of mandamus from Ninth Circuit Court of Appeals), *cert. denied sub nom. Flanagan v. McDonnell Douglas Corp.* (1976), 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761. Factual questions regarding damages for injuries of this type will not be common to the class, as each class member's situation is different and must be independently assessed.

The citizens cite *Clark v. Lee* (1980), Ind., 273 Ind. 572, 406 N.E.2d 646, and *Skalbania v. Simmons* (1982), Ind.App., 443 N.E.2d 352, as two examples where this Court and our court of appeals upheld damage awards in class action lawsuits. However, unlike either of these cases, the instant case involved questions of fact regarding damages which were not common to the class. Moreover, the damage claims of the plaintiffs who testified in the trial court below were not typical of the claims of all class members.

*Skalbania, supra,* was a class action lawsuit brought by a class of season ticket holders against the Indianapolis Racers Hockey Team, its owner, Nelson Skalbania, the World Hockey Association, and its constituent hockey teams. The class sought compensation for their season ticket expenditures after the Indianapolis Racers professional hockey franchise ceased operation after only thirteen (13) of their forty (40) scheduled home games had been played. Although the theories of recovery were numerous, the *Skalbania* court held the trial court did not err in certifying the nine-count complaint as a class action. The compensatory damages sought in *Skalbania* were contractual in nature and could be precisely determined. As the *Skalbania* court put it: "We fail to see how it can be said that Count II [breach of contract] asks for more than compensation for the amount paid for the tickets. We have previously held that differences in the amount of recovery will not bar class treatment in a case which, viewed as a whole, is suitable for such an approach." *Skalbania,* 443

N.E.2d at 358. In *Clark, supra,* there likewise were common questions regarding liability and damages where this Court held the Occupational Income Tax Act of Indiana unconstitutional and upheld the trial court's ordering a refund of the occupation taxes collected from the members of plaintiffs' class. As in *Skalbania,* the individual damages in *Clark* were readily ascertainable. Such is not the case here.

But even if the damages were readily ascertainable, which they were not, there is yet another problem. Both subclasses, as defined, were overbroad. Because of the citizens' success in getting a temporary restraining order issued on February 5, 1980, *only those Gary citizens who were issued a handgun license from January 1 to February 5, 1978, were in danger of having their licenses expire due to the actions of the defendants herein.* But even these citizens were protected by the trial court's temporary restraining order of February 5, 1980, as Superintendent Shettle was enjoined from "taking any action to terminate any of the permits of the plaintiffs which have expired during the pendency of this cause." *Record* at 67. After the temporary restraining order issued on February 5, 1980, the evidence showed Superintendent Shettle issued handgun licenses to all the representative class members, regardless of the police chief's recommendations for denial. Accordingly, even if there were common questions of fact regarding the damages each class member suffered, which there were not, the overbreadth of the class resulted in an excessive award of compensatory damages.

■ We now turn to the issue of punitive damages. Hatcher and Motley maintain that punitive damages should not have been awarded, given the circumstances of this case. In addition, they challenge how the jury was instructed on this issue. The citizens argue the objection made to this instruction at trial was not sufficiently specific to preserve the error on appeal. We agree. Accordingly, any error in the instruction given has been waived.

The Seventh Circuit, in *Endicott v. Huddleston* (7th Cir.1980), 644 F.2d 1208, 1217, set forth the standard for punitive damages in a § 1983 action as requiring the showing of aggravating circumstances or malicious intent. We follow the Seventh Circuit's standard in this § 1983 action. The *Endicott* court, in upholding that part of the district court's judgment notwithstanding the verdict which reversed the jury's award of punitive damages, continued:

> Viewing the entire record in the light most favorable to Endicott, we agree with the district court that there was simply no evidence of aggravating circumstances or malicious intent in the initial denial of due process from which a jury could award punitive damages. There is undisputed testimony that the Board members consulted their legal advisor, State's Attorney Connell, to determine the necessary and appropriate procedures for the public hearing which plaintiff requested in 1974. While Connell advised the Board to proceed in a manner later deemed inadequate by the Illinois Appellate Court, there was no evidence of a malicious intent underlying Connell's faulty advice. *Had Connell and the Board persisted in their initial posture following receipt of the Illinois Appellate Court's opinion, their action certainly would have constituted "aggravating circumstances."* We have already concluded, however, that the County Board adopted appropriate procedures for the plaintiff's second hearing.

*Id.* at 1217 (emphasis added). In the instant case, we find the mayor acted in reckless disregard of the citizens' rights. While this may ordinarily entitle plaintiffs to an award of punitive damages in Indiana, we are guided by federal precedent in this § 1983 action. The question becomes whether there were sufficient aggravating circumstances present to warrant a punitive damage award. We find that there were. Unlike the case in *Endicott, supra,* the mayor and his chief of police did persist in their initial posture after the trial court ordered Acting Chief of Police Motley to "immediately process any applications received as provided by statute" and "not in any way or manner

delay the processing of said applications." *Record* at 126. There was sufficient evidence presented that the city's policy was to distribute the handgun license applications, but systematically recommend them for denial. This resulted in a delay in processing. While we have held this delay did not constitute a deprivation of a liberty or property interest without due process of law, it does, in our opinion, constitute an aggravating circumstance sufficient to warrant punitive damages here.

■ It is also apparent, however, that the overbreadth of the class not only resulted in an excessive amount of compensatory damages, but an artificially inflated punitive damage award as well. We therefore find the compensatory and punitive damages awarded by the trial court below must be reversed for two reasons. First, damages sought for the deprivation of a constitutional right should have been assessed individually. Second, the class, as defined, was overbroad. Nevertheless, in the interest of judicial economy, keeping in mind the events which took place occurred over ten years ago and affected a number of elderly residents, we choose to exercise our equitable power to fashion an appropriate remedy based on the evidence presented.

Accordingly, we now hold those citizens who were issued a handgun license from January 1 to February 5, 1978, were in immediate danger of having their licenses expire due to the actions of the defendants herein. They are the only members of the first subclass who would have been unable to obtain an application for a handgun license before the temporary restraining order issued. In their brief, the citizens contend the damages awarded, both compensatory and punitive, are not excessive when one divides the award by the one thousand nine hundred sixty one (1,961) members of the first subclass. Therefore, those citizens who were issued a handgun license from January 1 to February 5, 1978, are to be awarded one hundred one and 99/100 dollars ($101.99) in compensatory damages and two hundred twenty four and 38/100 dollars ($224.38) in punitive damages, their pro rata share of the compensatory and

punitive damage awarded to the first subclass of one thousand nine hundred sixty one (1,961) members pursuant to § 1983. In addition, the city of Gary is not to be held vicariously liable for the punitive damages assessed against Hatcher and Motley. *See Newport v. Fact Concerts, Inc.* (1981), 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (punitive damages cannot be awarded against a municipality pursuant to § 1983). The citizens are entitled to post-judgment interest on this award at the rate of twelve percent (12%), calculated from April 6, 1983, the date of the trial court's order entered on the jury verdict, pursuant to IC 24-4.6-1-101 (Burns 1981).

### V.

The city challenges nine specific jury instructions. We have already addressed three of them in their entirety: instructions numbered 2 (immunity), 29 (compensatory damages), and 8 (punitive damages). Before we address the remaining six instructions, we note the jury's finding of liability was wholly supported by both the law and the evidence. The damages awarded, however, were excessive. Our review of this case thusfar has required an examination of the applicable law at the time the city officials took their action. Since this is a case of first impression, many of the issues regarding liability and immunity are purely legal. In light of the foregoing, the problems alleged by the city in the instructions to the jury, if in fact they were improper, cannot be said to have contributed to their finding of liability under § 1983 and are therefore, at most, harmless error. *Conder v. Hull Lift Truck, Inc.* (1982), Ind., 435 N.E.2d 10, 16.

■ Instruction number 5, given as modified, stated:

Under 42 U.S.C. Section 1983, [i]t is not necessary to find that the defendants had any specific intent to deprive the plaintiffs of their civil rights in order to find in favor of the plaintiffs. The plaintiffs are entitled to relief if the defendants acted in a manner which resulted in a violation of the plaintiffs['] rights.

*Record* at 489. The city objects to the mandatory language and lack of other elements comprising a tort, namely, proximate cause and resultant damages. It is undisputed that the city officials herein cut off the supply of handgun license application forms to those citizens who needed to renew their licenses in January of 1980. There is no issue regarding proximate cause. Under this instruction, the jury could have found a § 1983 violation and simply awarded no damages. This is, in essence, what they did in assessing one dollar ($1.00) in compensatory and punitive damages against various defendants and in favor of the second subclass. We discern no error here.

The city's objection to instruction number 7 is that it was not supported by the evidence insofar as not all 1,961 members of the first subclass suffered damages. The instruction invited the jury to speculate as to the amount of damages to be awarded. We have already resolved this issue in the city's favor and it is therefore moot. *See* previous discussion of instruction number 29 in Section IV., *supra.*

 Instruction number 11 set forth the statutory requirements to carry a handgun and the penalties for failing to comply with its provisions. The city's objection is that there was no evidence to support the giving of this instruction, which created issues which were not present in the case. We disagree. The jury was entitled to be instructed on the requirements of the Indiana Firearms Act and be aware of the penalties attendant thereto in order to discern why it was necessary for the citizens to obtain a handgun permit before they could legally carry a handgun outside their homes and places of business.

 Instruction number 18 reads as follows:

If you should find, from a preponderance of the evidence, that the defendants acted beyond the bounds of their lawful authority under state law, at the time and place alleged, then you may further find that the defendants did, "without due process of law," deprive the plaintiffs of liberty secured to them and protected by the Constitution and laws of the United States. And if you so find, then you must proceed to determine the amount of the actual or compensatory damages suffered or sustained by the plaintiffs, as a proximate result of the defendants' conduct.

If, however, you should find from a preponderance of the evidence in the case that the defendants acted within the bounds of their lawful authority then you should return a verdict in favor of the defendants; for, as previously stated, if the defendants acted within the limits of their lawful authority under the state law, then the defendants did not deprive the plaintiffs of any liberty "without due process of law."

*Record* at 506. The city objects to the mandatory language of the instruction, and correctly points out that mandatory instructions are not favored in the law. However, we see no grounds for reversal here. As stated, with regard to the second subclass, the jury found a violation of the law, but awarded only nominal damages. *See* discussion of instruction number 5, *supra.* The city presents no reversible error here.

Instruction number 22, given with modification, stated:

However [sic], under Indiana tort law, if the plaintiffs have established by a preponderance of the evidence that an officer's subordinate was engaged in a ministerial function, plaintiffs would nevertheless be entitled to recover on the basis of respondeat superior, since the officer was not protected by immunity.

*Record* at 510. This instruction is not only confusing, but is also erroneous. The statement: "the officer was not protected by immunity" is a bare legal conclusion which could have easily confused the jury with regard to "Indiana tort law." Insofar as we have vacated the jury's award of damages under the plaintiffs' "Indiana tort law" theory, however, the issue is moot. Regarding the jury's damage award under § 1983, it is possible that this instruction tainted the jury's immunity analysis. Nevertheless, the question of immunity for

purposes of § 1983 is mainly a question of law which turns on this Court's reading of *Matthews, supra.* Since we have already resolved this issue against the city's position, we find no reversible error.

Instruction number 28 allowed the jury to infer that if it found common representations were made to individual members of the plaintiffs' class, then they would have been made to each class member. The city argues this instruction was taken from another class action lawsuit involving fraud, something not alleged here. We see it as informing the jury all class members would have been told substantially the same things by the city officials had they tried to procure an application for a handgun license in January, 1980. In any event, since we have already resolved the issue of class certification and damages in the city's favor, this is a moot issue.

We now turn to the issue of attorney's fees.

### VI.

■■■ As amended, 42 U.S.C. § 1988, provides in pertinent part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

The issue, for purposes of awarding fees under § 1988, is whether the citizens can be considered the prevailing parties in enforcing their civil rights under § 1983.

In *Texas State Teachers v. Garland Indep. School Dist.* (1989), 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866, the United States Supreme Court addressed the standard of determining prevailing party status in the context of a lawsuit brought by the Texas State Teacher's Association and others against the Garland Independent School District and various school officials, challenging the school district's policy of prohibiting communications by or with teachers during the school day concerning employee organizations. The teachers claimed the school district's policy violated their First and Fourteenth Amendment rights in a number of respects. The *Garland* Court enumerated the issues the teachers prevailed on and noted the issues they lost. Citing *Hensley v. Eckerhart* (1983), 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40, the *Garland* Court set forth the proper standard for setting a fee award where the plaintiff has achieved only limited success:

> no fee award is permissible until the plaintiff has crossed the "statutory threshold" of prevailing party status.... "[a] typical formulation is that 'plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit.'"

*Garland,* 489 U.S. at 789, 109 S.Ct. at 1491, 103 L.Ed.2d at 875. The *Garland* Court continued:

> the *degree* of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all.

> Our decision in *Hensley* is consistent with congressional intent in this regard. Congress clearly contemplated that interim fee awards would be available "where a party has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on all issues." S.Rep. No. 94–1011, p. 5 (1976); see also H.R.Rep. No. 94–1558, p. 8 (1976), U.S.CODE CONG. & ADMIN.NEWS 1976, pp. 5908, 5912. In discussing the availability of fees *pendente lite* under § 1988, we have indicated that such awards are proper where a party "has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal." *Hanrahan v. Hampton,* 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980). ....
> A prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, ei-

ther *pendente lite* or at the conclusion of the litigation.

*Id.* at 790–791, 109 S.Ct. at 1492, 103 L.Ed.2d at 876 (emphasis in original).

The citizens herein prevailed in obtaining the injunctive relief sought. This success was on a significant claim which afforded the citizens immediate relief. On February 5, 1980, the trial court granted the citizens' request for a temporary restraining order and expressly reserved ruling until trial as to whether any member of the class could recover damages or whether attorneys fees could be awarded. On February 29, 1980, the trial court issued a preliminary injunction which was later modified by order of the trial court dated March 21, 1980. The city took an interlocutory appeal from the preliminary injunction, but the citizens prevailed. *Motley v. Kellogg* (1980), Ind.App., 409 N.E.2d 1207, *trans. denied.* At issue in the interlocutory appeal was the Indiana Firearms Act. The citizens' claim for compensatory and punitive damages, as well as their counsel's claim for a reasonable attorney's fee pursuant to 42 U.S.C. §§ 1983 and 1988, had not yet been adjudicated. The citizens prevailed in obtaining and successfully defending their preliminary injunctive relief on appeal on the basis of the Indiana Firearms Act, and not § 1983.

On appellate review, the trial court's judgment will be affirmed if sustainable on any theory or basis found in the record. *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154, 157. Although the injunctive relief sought was awarded and upheld on appeal pursuant to state law, it is also sustainable under § 1983. After a three day hearing on attorney's fees, the trial court issued twenty-four (24) findings in support of its award. Finding number nine (9) reads:

9. That the issues decided herein are all part and parcel of one matter in that they arise out of a common nucleus of operative fact and that the factual basis of the state and federal issues are virtually indistinguishable and are not truly fractionable.

*Record* at 4395. We review the trial court's decision to award attorney's fees and the amount thereof under an abuse of discretion standard. *Kahn v. Cundiff* (1989), Ind.App., 533 N.E.2d 164, 167, *aff'd* (1989), Ind., 543 N.E.2d 627. We agree with the trial court that the factual basis of the state and federal issues are not truly fractionable. We also find the final injunctive relief awarded, not here appealed, is sustainable not only under the provisions of the Indiana Firearms Act, but also under 42 U.S.C. § 1983.

Trial court findings numbered two (2) and three (3) read as follows:

2. That based upon the verdict and judgment thereon entered herein after trial by jury which commenced on the 1st day of March, 1983, and continued through the 6th day of April, 1983, the PRELIMINARY INJUNCTION issued on the 29th day of February, 1980, and as modified on the 20th day of March, 1980, and the DECLARATORY JUDGMENT AND PERMANENT INJUNCTION issued on the 30th day of August, 1983, under separate judgment and order of this Court, the plaintiffs are the "prevailing party" as that term is defined pursuant to 42 U.S.C. § 1988 and as it applies to the defendants City of Gary, Indiana, Richard Gordon Hatcher, Virgil L. Motley and Frederick P. Kowsky.

3. That pursuant to 42 U.S.C. § 1988 counsel for the plaintiffs herein are clearly entitled to a separate judgment in the nature of "a reasonable attorney's fee as part of the costs" of the within action.

*Record* at 4393. Because the injunctive relief granted was a significant claim which afforded the citizens immediate relief, the trial court properly found the plaintiffs to be the prevailing parties for purposes of § 1988. *Garland, supra.*

The *Garland* Court ended its opinion with the following words:

Application of the principles enunciated above to the case at hand is not difficult. Petitioners here obtained a judgment vindicating the First Amendment rights of public employees in the workplace. Their success has materially altered the school district's policy limiting the rights of teachers to communicate

with each other concerning employee organizations and union activities. Petitioners have thus served the "private attorney general" role which Congress meant to promote in enacting the Civil Rights Attorney's Fees Awards Act of 1976. They prevailed on a significant issue in the litigation and have obtained some of the relief they sought and are thus "prevailing parties" within the meaning of § 1988. We therefore reverse the judgment of the Court of Appeals and remand this case for a determination of a reasonable attorney's fee consistent with the principles established by our decision in *Hensley v. Eckerhart.* *Garland*, 489 U.S. at 793, 109 S.Ct. at 1494, 103 L.Ed.2d at 878.

The same is true here. The trial court did not abuse its discretion in deciding to award a reasonable attorney's fee. In addition, merely because the citizens were unable to preserve on this appeal the entire compensatory and punitive damages awarded at trial below does not affect their prevailing party status for purposes of § 1988. This is especially true since we now explicitly recognize a liberty or property interest in carrying a handgun with a license, provided all requirements of the Indiana Firearms Act are met. We also hold this state created, substantive right was clearly established at the time Mayor Hatcher announced his policy, and therefore, the city and its officials are not immune from damages. As was the case in *Garland, supra,* the citizens' success herein has materially altered the city of Gary's policy with regard to the issuance and processing of handgun license application forms. We hold they are entitled to a reasonable award of attorney's fees.

■ The city challenges the amount of fees awarded as excessive due to duplication of effort by the citizens' counsel along with the time not reasonably necessary to the pursuit of this case. The city also challenges the trial court's applying a multiplier of two (2) to the fees awarded. As stated, we review the trial court's decision to award attorney's fees and the amount thereof under an abuse of discretion stan-

dard. *Kahn, supra.* We turn first to the reasonableness of the base fee. The trial court, citing *Johnson v. Georgia Highway Express, Inc.* (5th Cir.1974), 488 F.2d 714, in its fifth finding, took into account the following factors: the time and labor required; the novelty and difficulty of the questions; the skill requisite to perform the legal service properly; the preclusion of employment by the attorney due to the acceptance of the case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount of time involved and the results obtained; the experience, reputation and ability of the attorneys; the "undesirability" of the case; the nature and length of the professional relationship with the client; and awards in similar cases. We note that *Johnson, supra,* was cited by Congress as enumerating the appropriate standards in determining the amount of fees to be awarded under 42 U.S.C. § 1988. S.Rep. No. 1011, 94th Cong., 2nd Sess. 6, *reprinted in* 1976 U.S. CODE CONG. & ADMIN.NEWS 5908, 5913; *accord* H.R.Rep. No. 1558, 94th Cong., 2nd Sess. 8 (1976). We have reviewed the trial court's findings in relation to the factors enumerated above as well as the city's numerous citations to the record for evidence of significant duplications of effort.

We discern no abuse of discretion in finding the number of hours expended at trial were reasonably necessary in order to perform the legal services for which compensation was sought. However, the trial court clearly abused its discretion in awarding attorney's fees for eighty (80) hours spent on "preparation of notices" and sixty (60) hours of "photostating documents." Clearly, such services cannot be billed at a lawyer's hourly rate. Nor can the citizens' counsel be awarded reasonable attorney's fees for appearing on a local radio program and discussing the case. This part of the award obviously cannot stand. We see no abuse of discretion in the trial court finding the hourly rates charged, one hundred dollars ($100.00) for "preparation" and one hundred fifty dollars ($150.00) for "trial services," were reasonable.

■ The next issue is whether the trial court abused its discretion in applying a multiplier of two (2) to the "lodestar" amount of attorney's fees. The trial court's findings in this regard are as follows:

20. That the plaintiffs' counsel are entitled to not only a fully compensatory fee but, based upon exceptional success which takes into account those factors not already considered in the first step "lodestar" figure as set forth above, an enhanced award is warranted by an adjustment thereto and in awarding same the Court has considered, inter alia, the relationship between the amount of the fee awarded and the results obtained.

21. That in view of the above and that the performance of plaintiffs' counsel contributed to producing law of significant precedential value in the state of Indiana, the undesirability of the case, the limited prelitigation likelihood that plaintiffs would prevail on their claim for compensatory and punitive damages, the aggravating conduct of the defendants (see para. "11.", supra) the results obtained, the delay in payment between the time legal services were rendered and the time the fees actually will be recovered, the preclusion of employment by the attorney due to the acceptance of the case, and the time limitations imposed by the client and the circumstances of the case, counsel for the plaintiffs are entitled to a multiplier of 2.0.

*Record* at 4398.

The burden of proving that an upward adjustment is necessary to the determination of a reasonable fee is on the fee applicant. *Blum v. Stenson* (1984), 465 U.S. 886, 898, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891, 901. In *Blum*, the Supreme Court reversed the Second Circuit Court of Appeals' fifty percent (50%) enhancement of attorney's fees. Although it noted that in *Hensley v. Eckerhart* (1983), 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40, 52, the Court recognized "in some cases of exceptional success an enhanced award may be justified," the *Blum* Court went on to say:

The statute [42 U.S.C. § 1988] requires a "reasonable fee," and there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high. When, however, the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee contemplated by § 1988.

*Id.* at 897, 104 S.Ct. at 1548, 79 L.Ed.2d at 901.

The *Blum* Court discussed an upward adjustment in attorney's fee awards for "exceptional" success with the following language:

Neither complexity nor novelty of the issues, therefore, is an appropriate factor in determining whether to increase the basic fee award.

.... The "quality of representation," however, generally is reflected in the reasonable hourly rate. It, therefore, may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional."

*Id.* at 898–99, 104 S.Ct. at 1549, 79 L.Ed.2d at 902. The trial court found plaintiff's success to be "exceptional," and considered the significant precedential value of this case in awarding an enhanced fee. Although the precedent set today is significant because this is a case of first impression, we consider this to be in the same category as "complexity [and] novelty of the issues" and therefore an inappropriate consideration in awarding an enhanced fee.

We note the trial court stated, in enhancing the fees awarded, it would take into account those factors not already considered in the first step "lodestar" figure as set forth above. In its next set of findings, however, it did exactly that, considering the undesirability of the case, the preclusion of employment and the time limitations imposed in awarding an en-

hanced fee. These three factors were already used in arriving at a reasonable fee based on *Johnson, supra,* and should not have been considered in enhancing the award. Moreover, the trial court should not have considered any "delay in payment" in awarding an enhanced fee, since it expressly ordered post-judgment interest to accrue at the rate of twelve percent (12%) in accordance with IC 24–4.6–1–101 (Burns 1981).

The trial court also relied on the "limited prelitigation likelihood that plaintiffs would prevail on their claim for compensatory and punitive damages" as well as the "results obtained" in awarding an enhanced fee. As stated, merely because the citizens were unable to preserve on this appeal the entire compensatory and punitive damages awarded at trial below does not affect their prevailing party status for purposes of § 1988. However, it does affect the "results obtained" for purposes of an enhanced fee award. (We note parenthetically the *Blum* Court expressly did not consider whether the risk of not being the prevailing party in a § 1983 case may ever justify an upward fee adjustment. *Blum,* 465 U.S. at 901 n. 17, 104 S.Ct. at 1550 n. 17, 79 L.Ed.2d at 903 n. 17. *Compare Pennsylvania v. Delaware Valley Citizens' Council for Clean Air* (1987), 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585, where a plurality of the Court reversed an enhancement of attorney's fees based on § 304(d) of the Clean Air Act to compensate for an attorney's assuming the risk of loss and of nonpayment. Justice O'Connor, concurring in part and in judgment, held Congress did not intend to foreclose consideration of contingency fees in setting reasonable fees under fee-shifting statutes. The dissenters held Congress did intend for an upward adjustment in appropriate circumstances for cases taken on a contingency basis.)

The trial court also erroneously considered the aggravating conduct of the defendants in awarding an enhanced fee. As Justice O'Connor put it in her concurring opinion in *Pennsylvania, supra:*

> The considerations used by the District Court to justify the enhancement—the "new and novel issues" raised by the case, and the stubbornness of the defendants, 581 F.Supp. 1412, 1431 (1984)—should already be reflected in the number of hours expended and the hourly rate, and cannot be used again to increase the fee award.

*Pennsylvania,* 483 U.S. at 734, 107 S.Ct. at 3091, 97 L.Ed.2d at 603 (O'Connor, J., concurring in part).

For all of the foregoing reasons, we find the trial court erroneously applied a multiplier to the lodestar fee it awarded.

■ Finally, we note the city argues since no damages were awarded against Police Chief Kowsky under § 1983, the citizens are not a "prevailing party" as to him and therefore he should not be liable for any attorney's fees. We agree. Kowsky was not chief of police in January, 1980. Although the evidence showed he improperly recommended certain handgun license applications for denial, Shettle issued these licenses over Kowsky's negative recommendations. Kowsky had no part in refusing to distribute the applications in January, 1980. There was some evidence presented that a number of applications were completed and returned, but never forwarded to the state police in 1982. However, as previously stated, the citizens presented no evidence that any of these applications belonged to those members of the plaintiffs' class to whom the jury ultimately awarded damages.

The city also argues that if an award of fees is granted based on the citizens obtaining the injunctive relief sought, then Superintendent Shettle should be solely responsible for the fees awarded. On the contrary, the jury correctly and completely exonerated Superintendent Shettle from any wrongdoing, and awarded no money damages against him. He is not liable in any manner for the attorney's fees to be awarded.

Transfer is granted, the opinion of the Court of Appeals designated *City of Gary v. Kellogg* (1988), Ind.App., 519 N.E.2d 570 is vacated, and this cause is remanded to

the trial court for further proceedings consistent with this opinion.

SHEPARD, C.J., DeBRULER and GIVAN, JJ., concur.

DICKSON, J., concurs as to sections II, III, and V of the majority opinion, but dissents as to sections I, IV, and VI, without separate opinion.